UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD, *et al.*,           )
                                   )
                    PLAINTIFFS     )     Civil Action No. 1:21-cv-465 (BAH)
            vs.                    )
                                   )
J. THOMAS MANGER, *et al.*,        )
                                   )
                                   )
                    DEFENDANTS     )
                                   )
_____)

## PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. Pro. Rule 56, Plaintiffs respectfully cross-move for summary

judgment. A Memorandum of Points and Authorities, Statement of Facts, and Proposed Order

are attached.

Respectfully Submitted,

  __/s/ Jeffrey Light_____
    Jeffrey L. Light, D.C. Bar #485360
    1629 K St., NW, Suite 300
    Washington, DC 20006
    (202)277-6213
    Jeffrey@LawOfficeOfJeffreyLight.com

    *Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD, *et al.*,                              )
                                                      )
                    PLAINTIFFS                        )     Civil Action No. 1:21-cv-465 (BAH)
          vs.                                         )
                                                      )
J. THOMAS MANGER, *et al.*,                           )
                                                      )
                                                      )
                    DEFENDANTS                        )
                                                      )
_____              )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.       The court has jurisdiction to hear the case.**

The Court's jurisdiction in this case rests on 28 U.S.C. § 1361. Under that statute, "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Defendants contend that Plaintiffs cannot rely on this statute because "[i]t is well settled that [section 1361] does not by itself waive sovereign immunity," *quoting Wash. Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d 897, 901 (D.C. Cir. 1996) (*WLF II*). (Def. Mem. MSJ at 6.) The D.C. Circuit's opinion in *WLF II*, however, went on to explain that "[i]f a plaintiff seeks a writ of mandamus to force a public official to perform a duty imposed upon him in his official capacity, however, no separate waiver of sovereign immunity is needed." 89 F.3d at 901. This doctrine is known as the "*Larson-Dugan* exception,"[1] and whether it "applies to this case depends upon whether the Government has a duty to the plaintiff, *viz.* to

_____

[1] *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949); *Dugan v. Rank*, 372 U.S. 609 (1963).

allow it access to certain government records." *Id.* Defendants deny that they have such a duty and therefore "the question of jurisdiction merges with the question on the merits[.]" *Id.*

Defendants seek to avoid the D.C. Circuit's holding in *WLF II* by arguing that Plaintiffs have alleged only "a failure to act under supposed statutory duties in Counts II and III, and in Count I that Defendants have violated a common law right of access to the requested records—not that they have exceeded their statutory or constitutional powers." (Def. Mem. MSJ at 6-7.) However, the Supreme Court explained in *Larson* that the exception covers situations where "[t]he officer is *not doing the business which the sovereign has empowered him to do* or he is doing it in a way which the sovereign has forbidden." 337 U.S. at 689. Relying on this language, the D.C. Circuit in *WLF II* applied the *Larson-Dugan* exception to an alleged failure to disclose documents under the common law right of access. 89 F.3d at 901.

Further, in *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305 (D.D.C. 2020) ("*Judicial Watch I*"), *aff'd on other grounds*, 998 F.3d 989 (D.C. Cir. 2021) ("*Judicial Watch II*"), this Court considered and rejected a similar argument to the one Defendants have made here. As this Court explained in *Judicial Watch I*, "[s]hould the common-law right of access apply to the requested records, then HPSCI's exercise of discretion (upon majority vote of Committee members) whether to release those records to plaintiff would be cabined accordingly by the legal duty or obligation to fulfill plaintiff's request." *Id.* at 312-13. Here, if 2 U.S.C. § 1909 or the common law requires Defendants to disclose the requested documents, Defendants' decision whether to disclose the records in response to Plaintiffs' request is cabined accordingly.

Finally, the government argues that the mandamus statute "'is only a source of jurisdiction for district courts to exercise writs of mandamus to employees of the *Executive* branch,' *United States v. Choi*, 818 F. Supp. 2d 79, 84 (D.D.C. 2011), and is insufficient to maintain a suit against the Legislative Branch officers who are Defendants in this case." (Def. Mem. MSJ at 7) (emphasis in original). This argument, however, is foreclosed by the D.C. Circuit's decision in

*WLF II*, which specifically applied the mandamus statute outside of the executive branch. The *Choi* court never cited *WLF II* and rested its conclusion entirely on out-of-circuit precedent. The *Choi* court's failure to consider *WLF II* is unsurprising, however, given that *Choi* involved the authority of a district court judge to review the decision of a magistrate judge pursuant to the All Writs Act, 28 U.S.C. § 1651, and the petitioner in that case did "not argue that 28 U.S.C. § 1361 grants the requisite authority." 818 F. Supp. 2d at 84. Accordingly, *WLF II* governs this case and no separate waiver of sovereign immunity is required.

**II.   Plaintiffs have a common-law right of access to the Capitol Police Directives.**

  **A.  The Capitol Police Directives are public records.**

Under *WLF II*, 89 F.3d at 902, a "public record" is "a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived.") The Capitol Police Directives (hereinafter "Directives") are government documents which set forth departmental policies. They can thus be viewed as memorializing "statement[s]" of the agency's policies. Alternatively, each Directive can be viewed as memorializing the decision or action of the Chief of Police in adopting the Directive. In this sense, the Directives, which are signed by the Chief of Police, (Ex. 1) are an "act" of the Capitol Police in the same way that a bill signed by the President is an "act" of Congress.

Defendants contend that the Directives are not public records for two interrelated reasons. First, they argue that "[n]one of these directives is a written memorial [] created and kept for the purpose of preserving a precise record of an official decision or action." (Def. Mem. MSJ at 18) (internal quotation marks omitted, second alteration in original). This argument misses the mark because the D.C. Circuit's definition of a "public record" includes not just an official "action" or

3

"decision," but also a "statement." Additionally, Defendants' argument fails because the Directives are indeed created and kept to memorialize the agency's "action" or "decision." The specific action or decision which they memorialize is the agency's adoption of the policies contained in the Directives as official agency policy.

Defendants also argue that the Directives are not public records because "any given USCP directive provides instruction or guidance to a USCP employee on how take official action or to reach an official decision[.]" (Def. Mem. MSJ at 18.) According to Defendants, this qualifies the Directives as "the preliminary materials upon which an official relie[s] in making a decision or other writings incidental to the decision itself." (Def. Mem. MSJ at 18) (internal quotation marks omitted, alteration in original). This argument fails because the Directives have legal significance and are therefore, by definition, not merely preliminary.

### i. A public record may consist of a "statement."

Defendants do not dispute that the Directives qualify as a "statement," as that term is used by the D.C. Circuit in *WLF II*. Instead, Defendants argue that only an "official decision or action" qualifies as a written memorial. (Def. Mem. MSJ at 18.) The government quotes from a passage in *WLF II* in which the D.C. Circuit stated, "In the governmental context, a written memorial is a writing created and kept for the purpose of preserving a precise record of an official decision or action." 89 F.3d at 905. However, Defendants take this quote out of context.

In *WLF II*, the D.C. Circuit began its analysis of what constitutes a public record by surveying the common law of the states. 89 F.3d 897, 904. The court found that the "common ground" among the states' definition was "limit[ed] to access to documents that can fairly be called 'written memorials[.]'" *Id.* at 905. The D.C. Circuit explained that "[i]n the governmental

context, a written memorial is a writing created and kept for the purpose of preserving a precise record of an official decision or action." The requirement of a "written memorial," however was only a "starting point" from which the court could "discern the outline of a definition suitable for the purposes of federal common law." *Id.* The definition of a public record ultimately adopted by the D.C. Circuit was not limited to official "decision[s]" or "action[s]," however. Instead, the D.C. Circuit held "as a matter of federal common law, that a 'public record'--that is, a record to which the public has a right of access, subject to the balance of public and governmental interests--is a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *Id.* at 905.

This definition adopted by the D.C. Circuit, that court concluded, would "avoid the necessity for judicial application of the second-step balancing test to documents that are preliminary, advisory, or, for one reason or another, do not eventuate in any official action or decision being taken." *Id.* Thus, a "public record" may be one which "eventuate[s]" in an official action or decision, but is not itself a "writing created and kept for the purpose of preserving a precise record of an official decision or action." *Id.* This understanding of the D.C. Circuit's holding is consistent with how judicial records are treated. For example, a brief and appendix submitted by a party in litigation does not itself record "an official decision or action," but is nevertheless a public record if a court relies on it in reaching a decision. *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 668 (D.C. Cir. 2017).

### ii.      Records that have legal significance are not preliminary material.

Defendants argue that the Directives are not public records because "any given USCP directive provides instruction or guidance to a USCP employee on how take official action or to

reach an official decision[.]" (Def. Mem. Mot. SJ at 18.) According to Defendants, this qualifies the Directives as "the preliminary materials upon which an official relie[s] in making a decision or other writings incidental to the decision itself." (Def. Mem. Mot. SJ at 18) (internal quotation marks omitted, alteration in original). While Defendants accurately quote from the D.C. Circuit's decision, they misunderstand what the court meant by "preliminary materials" and "writings incidental to the decision itself." *WLF II*, 89 F.3d at 905.

In referring to materials which are "preliminary" or "incidental," the D.C. Circuit was not carving out an exception to its general definition of public records. Rather documents which are "preliminary, advisory, or, for one reason or another, do not eventuate in any official action or decision being taken" are not public records precisely because they have no "legal significance" and therefore fall outside the definition articulated by the D.C. Circuit. This Court has likewise observed that materials which are "so preliminary to any final recommendation . . . lack[] the legal significance to constitute a 'public record' to which the right of public access attaches." *Judicial Watch I*, 474 F. Supp. 3d at 316.

Accordingly, "materials upon which an official relied in making a decision or other writings incidental to the decision itself" include "the report of a blood test provided in support of an application for a marriage license, the job application of a would-be government employee, a government auditor's preliminary notes used in the preparation of an official report, or a cover memorandum circulated with a copy of an official report or study." *Id.* at 905-906. On the other hand, materials which have "legal significance" are by definition not "preliminary" or "incidental." For example, a motion filed in court is clearly "preliminary" to a decision by the court on the motion, but it is not therefore excluded from the definition of a public record because it has legal significance. As the D.C. Circuit explained, "[t]he part of the exclusion

relating to 'preliminary' or 'advisory' records, however, we found inapplicable to judicial records, noting that '[a] court proceeding … is in its entirety and by its very nature a matter of legal significance.'" *United States v. El-Sayegh*, 131 F.3d 158, 162 (D.C. Cir. 1997), *quoting WLF II*, 89 F.3d at 906. As explained below, the Directives are not preliminary because by their very nature they have legal significance.

### iii.    The Directives are not preliminary because they have legal significance as binding statements of official USCP policy.

Despite Defendants' characterization of the Directives as preliminary and merely providing guidance to agency employees, these internal documents are binding on USCP employees. USCP Directive 2053.013 ("Rules of Conduct"), Rule A3: Compliance with Directives explicitly states, "Employees are required to obey all Departmental . . . Directives[.]" (Ex. 1 at 2.) When USCP employees are alleged to have violated the Directives, this Court has given legal effect to the Directives. *Breiterman v. United States Capitol Police*, Civil Action No. 16-893 (TJK), 2020 U.S. Dist. LEXIS 162663 (D.D.C. Sep. 4, 2020) (USCP disciplined officer for violation of directive); *Moran v. United States Capitol Police*, 82 F. Supp. 3d 117 (D.D.C. 2015) (same); *Anyaso v. United States Capitol Police*, 39 F. Supp. 3d 34 (D.D.C. 2014) (same).

In addition to binding individual USCP employees, the Directives have enough legal significance that they can be subjected to judicial review, and some Directives have actually been successfully challenged in federal court. *See United States Capitol Police v. Office of Compliance*, 908 F.3d 776 (Fed. Cir. 2018) (considering various directives under collective bargaining agreement). Even as to outside parties, internal law enforcement policy statements have legal significance. In a recent case, for example, this Court allowed a challenge to BOP

internal program statement as arbitrary and capricious. *Jordan v. FBI*, Civil Action No. 20-01478 (CKK), 2021 U.S. Dist. LEXIS 172738 (D.D.C. Sep. 13, 2021).

Even if this Court accepts the premise that there is a category of materials which have legal significance, but yet are still preliminary or incidental, the Directives would not fall within this category of materials. Materials which have legal significance and represent an agency's official position are not preliminary merely because they resemble a rule rather than an adjudication. *See e.g., Trea Senior Citizens League v. United States Dep't of State*, 994 F. Supp. 2d 23 (D.D.C. 2013) (ordering release of a record under FOIA over the defendant's assertion of Exemption 5 because the record represents "an expression of final agency policy[.]")

### iv.     In the alternative, the Directives are not preliminary because they memorialize a final order of the Chief of Police

In addition to memorializing USCP policy, the Directives are public records because they memorialize the order of the Chief of Police adopting the policy set forth in each Directive. Each Directive is a pronouncement, reduced to writing and signed by an individual authorized by statute to put it into force (Ex. 1 at 1, 2, 8). *Amos v. Gunn*, 84 Fla. 285, 343 (1922) ("A public record is a written memorial made by a public officer and that officer must be authorized by law to make it.") The Directives contain additional indicia of an order adopting an agency position such as sections superseding or repealing prior orders, describing the authority of the issuing authority, and defining key terms. (Ex. 1 at 1, 2, 8.) The Directives are not preliminary orders because once they are signed by the Chief of Police, there is nothing left to do to put them into effect.

### B.   The Capitol Police Board cannot withhold Capitol Police Directives on the grounds that they contain "security information" unless the withheld information meets the statutory definition of "security information."

Defendants contend that the Directives cannot be released because the common law of access is superseded by a statute, 2 U.S.C. § 1979. While it is true that a statutory nondisclosure provision may abrogate the common law right of access, this is true only when Congress has directly spoken to the issue. *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 669 (D.C. Cir. 2017) ("Although it is true that the *Hubbard* inquiry must yield to a statute when Congress has spoken directly to the issue at hand, the Dodd-Frank Act is not such a statute") (internal quotation marks and citation omitted). A statute may preempt the common law right of access when it "provides an extensive statutory regime for plaintiffs to request the information they seek," such as is the case with FOIA, *Ctr. for Nat'l Sec. Studies v. United States DOJ*, 331 F.3d 918, 936-37 (D.C. Cir. 2003), or the Presidential Records Act, *Nixon v. Warner Commc'ns*, 435 U.S. 589, 603, 606 (1978) ("Congress has created an administrative procedure for processing and releasing to the public, on terms meeting with congressional approval, all of petitioner's Presidential materials of historical interest, including recordings of the conversations at issue here. . . . The presence of an alternative means of public access tips the scales in favor of denying release.")

Defendants do not argue that Congress has provided an alternative statutory procedure for requesting Directives that preempts the common law right of access. Instead, Defendants argue that Plaintiffs have no common law right of access to the Directives containing security information "because 2 U.S.C. § 1979 prohibits their public disclosure." (Def. Mem. Mot. SJ. at 11.) That statute's nondisclosure provision prohibits USCP from disclosing "security information" unless the Capitol Police Board determines that the release of the security information will not compromise the security and safety of the Capitol buildings and grounds or any individual whose protection and safety is under the jurisdiction of the Capitol Police. 2

U.S.C. § 1979(b). Defendants do not suggest that this statute is a basis for withholding anything other than "security information," nor could they. Any attempt by the Defendants to rely on this statute to withhold non-security information would be *ultra vires*. *See Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (judicial review absent a cause of action is available "to determine whether the agency has acted 'ultra vires' -- that is, whether it has exceeded its statutory authority") (internal quotation marks omitted).

Assuming for the sake of argument that 2 U.S.C. § 1979 supplants the common law right of access as to "security information," the question becomes whether the withheld information falls within the statutory definition of "security information." According to the statute, the term "security information" means information that "(1) is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds; and (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the Capitol Police, or any incident command relating to emergency response." 2 U.S.C. § 1979(a).

Defendants assert that certain directives were "determined by a USCP document review team to be security information under § 1979," (Def. Mem. MSJ at 14) but this fact does not insulate the determinations from challenge. It has been long established that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Labs. v. Gardner, 387 U.S. 136, 140 (1967). While this case does not arise under the APA, the presumption of judicial review predates the APA and therefore not dependent on whether that statute applies to a particular

governmental agency. *Shields v. Utah I. C. R. Co.*, 305 U.S. 177, 185 (1938); *Stark v. Wickard*, 321 U.S. 288, 309 (1944).

Here, Defendants make no attempt to justify the review team's decisions. Instead, it relies on the mere conclusion of the review team combined with the fact that the directives are labeled "Law Enforcement Sensitive." The D.C. Circuit has held, however, that an unclassified document cannot be withheld simply because it is stamped "Law Enforcement Sensitive." Even if there is material within the documents which may be sensitive, the government must offer a rationale for withholding which is specific to the documents at issue. *Parhat v. Gates*, 532 F.3d 834, 836 (D.C. Cir. 2008) ("We also deny, without prejudice, the government's motion to protect from public disclosure all nonclassified record information that it has labeled 'law enforcement sensitive' as well as the names and "identifying information" of all U.S. government personnel mentioned in the record. Although we do not doubt that there is information in these categories that warrants protection, the government has proffered only a generic explanation of the need for protection, providing no rationale specific to the information actually at issue in this case.")

Here, the record is inadequate to determine whether the alleged security information fits within the scope of 2 U.S.C. § 1979. It is true that some of the titles of the Directives labeled as "SI" suggest that they may contain security information. *See e.g.*, 2081.013 ("Antivirus and Malware Protection") (Def. MSJ Ex. C), but the titles of other Directives labeled as "SI" do not suggest that they contain security information. *See e.g.*, 1010.002 ("Jurisdiction and Authority"). (Def. MSJ Ex. C). The Court should not simply accept Defendants' conclusory statements, but should instead order Defendants to present a reasonably detailed declaration explaining why each piece of information or category of information fits within the statutory definition of "security information." *Cf. Allen v. CIA*, 636 F.2d 1287, 1294 (1980) ("CIA's affidavits do little more than

parrot the language of Section 403(d)(3) by stating that 'intelligence sources and methods' will be compromised if the document is disclosed.")

Defendants also do not appear to have made any attempt to distinguish security from non-security information within individual Directives labeled as "SI." This document-by-document approach is not supported by the language of the statute. Under 2 U.S.C. § 1979, the USCP may withholding "security information." By referring to "security information" and not "documents containing security information," Congress plainly evinced an intent not to have decisions on withholding be made on a document-by-document basis. Moreover, since this withholding statute is in derogation of the common law right of public access to congressional records, it should be construed narrowly. *Schwartz v. United States DOJ*, 435 F. Supp. 1203, 1204 (D.C. Cir. 1977). Thus, the Court should not rewrite the term "information" in the statute to mean "documents." Congress understands the difference between "information" and "documents" and chose here to use the term "information." *Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material.")

The government should be ordered to review the Directives and redact only the information it claims is sensitive. "[R]edaction is a familiar technique," *Dep't of the Air Force v. Rose*, 425 U.S. 352, 381 (1976), including in cases involving the common law right of access, *Leopold v. United States*, 964 F.3d 1121 (D.C. Cir. 2020). The government offers no explanation as to why redaction of sensitive information is not possible here.

### C. Defendants have failed to demonstrate that the government's interest in secrecy outweighs the public's interest in disclosure.

The conclusion that documents are public records does not automatically require them to be released. The D.C. Circuit has explained that if a district court concludes that documents are public records, the court should then "proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure." *Wash. Legal Found. v. United States Sentencing Comm'n*, 17 F.3d 1446, 1451-52 (D.C. Cir. 1994) (*WLF I*). The D.C. Circuit has cautioned "that this balancing test should not be an abstract inquiry, but should focus on the specific nature of the governmental and public interests as they relate to the document itself, as well as the general public interest in the openness of governmental processes." *Id.* at 1452.

As to the non-SI Directives, the government has made no attempt at all to justify the need for secrecy, instead strategically choosing to argue only that these Directives are not public records. As to the SI Directives, the government offers no more than the conclusion of its review team that the Directives contain sensitive information. Defendants have therefore failed to overcome the presumption of openness under the common law right of public access for either type of Directive. *In re Application for Access to Certain Sealed Video Exhibits*, No. 21-MC-78 (JDB), 2021 U.S. Dist. LEXIS 122124, 2021 WL 2711706 (D.D.C. June 30, 2021) ("[A] conclusory assertion is insufficient to overcome the strong presumption in favor of public access.")

While the government has presented no substantive arguments in favor of secrecy, Plaintiffs will nevertheless briefly describe the public interest side of the balance. In general, "[m]atters of substantive law enforcement policy . . . are properly the subject of public concern," *Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082, 1093 (D.C. Cir. 2014) (alterations in original). More specifically, as one commentator observed, "department rules governing the use of [surveillance] techniques - which crimes, based on what threshold level of suspicion, and with whose approval - can be made public and publicly debated without

13

undermining law enforcement interests. That is what Title III does. As Senator Ron Wyden said in the context of the NSA's secret interpretation of its authority, 'The law should never be kept secret. Voters have a right and a need to know what the law says and what their government thinks the text of the law means.'" ARTICLE: DEMOCRATIC POLICING, 90 N.Y.U.L. Rev. 1827, 1885 (Dec. 2015). Here, for example, one of the records sought by Plaintiffs is Directive 1032.002 ("Interception or Recording of Wire or Oral Communications") (Def. MSJ Ex. C). While some portions of the Directive might need to be redacted to withhold operational details, the Directive is undoubtedly of public interest. *See ACLU v. United States DOJ,* 655 F.3d 1, 12-13 (D.C. Cir. 2011) ("The use of and justification for warrantless cell phone tracking is a topic of considerable public interest: it has received widespread media attention and has been a focus of inquiry in several congressional hearings[.]") The public interest in transparency over the USCP is particularly acute because the agency has historically operated with greater secrecy than other law enforcement agencies, having no civilian review board and being exempt from FOIA. *See* Tom Dreisbach, "'The Worst I've Seen': Capitol Police Face Scrutiny For Lack Of Transparency, *NPC* (May 7, 2021), *available at* https://www.npr.org/2021/05/07/994320154/the-worst-ive-seen-capitol-police-face-scrutiny-for-lack-of-transparency (last accessed Nov. 11, 2021).

In order to target the Directives having public interest, Plaintiffs narrowed their request to have a greater focus on those involve police interactions with the public. (Joyce Decl. ¶ 8; Def. MSJ Ex. C.)[2] Disclosure of most of these Directives would directly benefit the public in many of

---

[2] As a result of Plaintiffs' narrowing, the only non-SI Directives that remain at issue are those listed in Exhibit C to Defendant's Motion for Summary Judgment. Plaintiffs were not presented with the list of SI Directives prior to Defendants' filing of their Motion for Summary Judgment. Accordingly, the list of SI Directives in Exhibit C does not have a similar focus. Should the Court order Defendants to produce a *Vaughn*-like index, Plaintiffs are willing to confer with

the same ways that disclosure of local police force policies benefit the public, including: by

improving community interactions with USCP, by increasing the accuracy of reporting on USCP

policies, by giving the public a better sense of how USCP operates, and by enabling public

oversight of USCP's performance.[3] As one commentator explained, "Effective police

accountability should be publicly transparent. For the public to fairly judge their local law

enforcement's adherence to constitutional principles and practices, they need to be adequately

informed about law enforcement's policies and practices. A department could have all the best

internal accountability mechanisms, but without being publicly accessible and transparent, it may

not be responsive to community concerns. Therefore, effective accountability must rely heavily

on a transparent approach that gives the public the information it needs to make fair and

informed judgments about its police departments and their actions." Michael D. White, *Article:*

*How Can we Achieve Accountability in Policing? The (Not-So-Secret) Ingredients to Effective*

*Police Reform)*, 25 Lewis & Clark L. Rev. 405, 419.

Specific examples Directives having a strong bearing on the public interest are Directives

1020.001 ("Bias-Based Profiling") and 1020.004 ("Use of Force"). (Def. MSJ Ex. C.) The topics

of these Directives are the subject of significant public debate in general, as well as with respect

to the actions of the USCP in particular. *See Pasadena Police Officers Ass'n v. Superior Court*,

240 Cal. App. 4th 268, 295 n.16 (2015) (noting the public interest in "the complex and nuanced

debate surrounding police use of force and allegations of institutional racism"); *Mendez v. City of*

---

Defendants to determine if any additional Directives can be excludes from the scope of the
request.

[3] These are among the reasons that the D.C. Complaints Board cited in explaining why the
Metropolitan Police Department should publish its orders online. *See* "Publication of MPD
Orders on the Internet," (Ex. 2). Ultimately, the Superior Court ordered the disclosure of the
MPD General and Special Orders in *Partnership for Civil Justice Fund v. District of Columbia*,
Case No. 2009 CA 000748 B (Super. Ct. Marc. 13, 2012) (Macaluso, J.)

*Gardena*, 222 F. Supp. 3d 782, 785 (C.D. Cal. 2015) ("There is currently an intense public debate about police officers' use of force and public oversight thereof"); Ursula Perano, "Acting Capitol Police chief: Officers were unsure of lethal force rules on Jan. 6," Axios (Feb. 24, 2021), *available at* https://www.axios.com/capitol-police-hearing-january-6-lethal-force-f9af71c0-380e-444a-a365-f01bdec7b37e.html (last accessed Nov. 11, 2021); Nathan Baca, "January 6 forever changed US Capitol Police operations. Here's what challenges they face now," WUSA9 (Feb. 19, 2021), *available at* https://www.wusa9.com/article/news/national/capitol-riots/capitol-police-under-investigation-since-january-6-riots/65-d048765e-eedc-4df0-b1b6-a9c1994e0433 (last accessed Nov. 11, 2021) ("New intel shows that Capitol Police were under orders not to use lethal force during the Jan. 6 riot, according to one congressman"); Kimberley Dozier, "Accusations of Bias, Racism Swirl Around Capitol Police After Mob Attack," Time (Jan. 8, 2021), *available at* https://time.com/5928204/capitol-police-mob-attack/ (last accessed Nov. 11, 2021).

### III.   Defendants have not provided any justification for withholding the USCP annual financial statements.

Under 2 U.S.C. § 1903(b)(2), "The Chief Administrative Officer shall . . . (D) Prepare annual financial statements for the Capitol Police, and such financial statements shall be audited by the Inspector General of the Capitol Police or by an independent public accountant, as determined by the Inspector General." Plaintiffs requested both the annual financial statements prepared by the Chief Administrative Officer and the audit of the statements performed by the IG. (Def. MSJ Ex. B) ("I request all such annual financial statements *and* audits for the period of 2015 forward") (emphasis added). However, Defendants have not set forth any reason as to why the financial statements are being withheld. Defendants claim a right to withhold all OIG information as well as the requested Directives, but the financial reports prepared by the Chief Administrative

Officer are neither Directives nor OIG information. These financial statements fall squarely within the definition of a public record set forth in *WLF II*. Indeed, the D.C. Circuit explicitly stated, "If applied at the state level the definition we adopt would encompass, for example, a report or record of government expenditures[.]" 89 F.3d at 905.

### IV. Plaintiffs have a common-law right of access to the Capitol Police Office of Inspector General's Semiannual Reports.

#### A. The Semiannual Reports are public records.

The Semiannual Reports (SARs) of the OIG are public records for two reasons. First, they memorialize the actions and decisions of the OIG. Specifically, SARs "summariz[e] the activities of the Office during the immediately preceding six-month periods." 5 U.S.C. App. § 5(a). Among other things, SARs must contain a variety of statistical tables. Some of the information that must be contained in these statistical tables include the total number of audit, inspection, and evaluation reports; the number of persons referred for prosecution; and the total number of indictments and information that resulted. 5 U.S.C. App. § 5(a)(8)-(9), (17). This type of information is an example of historical facts about what the OIG did, in contrast to a letter advising an agency as to a proposed course of conduct.

The SARs are also public records because they are final statements that have been communicated to Congress. In this sense, the reports function as officials statement that fulfill a statutory obligation, irrespective of the underlying facts and recommendations contained therein.

Although the SARs are public records under both rationales, their legal significance varies depending upon how they are viewed. As a memorialization of the actions and decisions of the OIG, the SARs have legal significance and are not preliminary because the historical fact of a decision being made or an action being taken is not subject to change at a later date. Insofar as

17

the SARs are created and transmitted to Congress to satisfy the requirements of 5 U.S.C. App. § 5(a), they are final and not preliminary because they represent the culmination of a process mandated by statute. Once a SAR has been transmitted to Congress, it marks the fulfillment of a legal obligation and there is nothing left for the agency to do as part of that process.

### i.     As a recording of historical facts, the SARs are not preliminary or recommendatory.

Much of the case law discussing whether agency actions are preliminary and recommendatory, or are instead final, arises in the context of challenges to agency action under the APA. While such cases may provide some guidance, they are largely inapposite here. In determining whether an agency action is sufficiently final to be susceptible to judicial review, courts engage in statutory construction of the term "final agency action" in the APA, as well as analysis of the issue of ripeness. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). Neither of these concerns are directly implicated here because the relevant inquiry is not whether the court should intervene in an agency's decisionmaking process, but rather whether the document at issue was "created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *WLF II,* 89 F.3d 897 at 905.

While SARs may contain some recommendatory language, their "purpose" is not to advise the agency, but rather to summarize for Congress facts about the OIG's actions and decisions. The SARs are analogous to a court docket sheet or "a list of tax abatements passed by a city council," *id.* at 905, the purpose of which is simply to record activity that has occurred after it has occurred. By contrast, the plaintiffs in *Judicial Watch I*, 474 F. Supp. 3d at 309, sought a

copy of the issued subpoenas and the documents received, rather than, say, a statistical table showing the numbers of subpoenas that issued in the previous year.

While it is true that the OIG lacks the enforcement powers possessed by the agency itself, that does not mean that its activities are inherently preliminary or pre-decisional. In *WLF II*, the body at issue was an Advisory Group which "had a very limited mission, namely, to recommend sentencing guidelines to the Sentencing Commission." 89 F.3d at 906. Yet despite the purely advisory nature of the group, the D.C. Circuit "disagree[d] with the district court that all of the documents still at issue in this case are 'pre-decisional,' some of them having been compiled after the release of the final report[.]" *Id.* Likewise, the SARs compile information on reports that have already been finalized by OIG, including reports as to which the USCP has taken a final action. *See* 5 U.S.C. App. § 5(f)(6) (defining "final action" for purposes of the SAR as "(A) the completion of all actions that the management of an establishment has concluded, in its management decision, are necessary with respect to the findings and recommendations included in an audit report; and (B) in the event that the management of an establishment concludes no action is necessary, final action occurs when a management decision has been made[.]")

To the extent that the SARs contain any recommendations or other information that may be privileged, this information withheld through appropriate redactions. However, as a general matter, the requirements of 5 U.S.C. App. § 5(a) suggest that the SARs will largely consist of factual material that does not reflect advice or editorial judgment and therefore would not qualify for the deliberative process privilege. *See Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2009) ("agencies must disclose those portions of predecisional and deliberative documents that contain factual information that does not inevitably reveal the government's deliberations.")

Further, the material will largely be post-decisional because the SARs are summarizing events
that have already occurred and decisions that have already been made.

### ii. As a matter of law, the final version of a document required by law to be created and maintained by an agency is not preliminary.

The D.C. Circuit declined to decide the question of whether documents may qualify as public

records by virtue of the fact that a government official is required by law to compile them. *WLF*

*II*, 89 F.3d at 906. The opinion in *WLF II*, however, points the way to the answer. In analyzing

the general contours of the definition of a public record, the D.C. Circuit relied on state common

law. *Id.* at 904. Picking up where the D.C. Circuit left off, state cases involving the common law

right of access have held that a document required by law to be created or kept by a public

officer is a public record. *Morris v. Smiley*, 378 S.W.2d 149, 152 (Tex. Civ. App. 1964), *quoting*

45 Am.Jur., p. 420 ("It is said that a public record is one required by law to be kept, or necessary

to be kept, in the discharge of a duty imposed by law"); *Robison v. Fishback*, 93 N.E. 666, 669

(Ind. 1911) (same); *Int'l Union, United Auto. etc. v. Gooding*, 29 N.W.2d 730, 735 (Wis. 1947)

("public records include . . . papers specifically required to be kept by a public officer");

*Charleston Mail Ass'n v. Kelly*, 143 S.E.2d 136, 139 (W. Va. 1965) ("That these records are

records that the law requires the state treasurer to keep is unalterably clear. We therefore hold

that these records are indeed public records").

These decisions are consistent with the D.C. Circuit's approach to defining what constitutes a

public record. The "required by law" concept fulfills the same purpose as the "written memorial"

element – to ensure that the documents are not merely preliminary or incidental. The two

concepts have been viewed at common law as alternatives. *Robison v. Fishback*, 93 N.E. 666,

669 (Ind. 1911) ("It is said that a public record is one required by law to be kept, or necessary to

be kept, in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said or done.")  Where a specific document is required by law to be created, the document is not just evidence of the process by which official business is conducted, it *is* the end product of the official business of the government. *See People v. Peck*, 34 N.E. 347, 350 (N.Y. 1893) (emphasis added) ("not to collect the facts merely to enable him to discharge a duty, but in the discharge of a duty.") Therefore, the fact that a document is required by law to be created is sufficient to guard against preliminary or incidental material being included in the definition of a public record.

### iii.   The Semiannual Reports are not preliminary because they are required by law to be created, to contain specific content, and to be transmitted to Congress.

As explained in the previous section, documents which are required by law to be created necessarily have legal significance. However, the issue before this Court can be decided on narrower grounds. The SARs are required by law to be created, 5 U.S.C. App. § 5(a), but also have other features which contribute to their legal significance and distinguish them from preliminary material. Specifically, the relevant statute specifies the content to be included in the SARs and also directs that they be transmitted to Congress.

By detailing the specific type of information which SARs must include and requiring them to be transmitted to Congress, 5 U.S.C. App. § 5 is more than just a general recordkeeping statute. Instead, it creates a legal obligation on the part of the agency to transmit to Congress a particular document, having particular contents, by a particular day. The SARs therefore have legal significance in their own right as statements, separate from the legal significance of the OIG's activities memorialized in the SARs. Indeed, one of the state common law cases cited by the D.C. Circuit in *WLF II* specifically held, "In all instances where, by law or regulation, a

document is *required to be filed in a public office*, it is a public record and the public has a right to inspect it") (emphasis added). *State ex rel. Kavanaugh v. Henderson*, 169 S.W.2d 389, 392 (Mo. 1943). *Accord Pulitzer Publ'g Co. v. Transit Cas. Co.*, 43 S.W.3d 293, 300 (Mo. 2001).

In other contexts as well, the filing of a report by an officer of the government contributes to the public's right to access it. Restat 2d of Torts, § 611, comment (d) ("The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege") (fair reporting privilege); *Harper v. Walters*, 822 F. Supp. 817, 826 (D.D.C. 1993) (noting that the purpose of the fair reporting privilege is "to disseminate information about government proceedings"); *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884) (Holmes, J.) (explaining that the fair reporting "privilege and the access of the public to the courts stand in reason upon common ground.") A SAR can readily be characterized as (1) a "report"; (2) by an "officer or agency of the government" (the IG or OIG); (3) which is "fil[ed]" with Congress. *See United States v. Chavez*, 416 U.S. 562, 576 (1974) (describing an annual oversight report as "filed with Congress" when the statute commanded the agency to "transmit to the Congress a full and complete report," 18 U.S.C. § 2519); *Fletcher v. United States*, 730 F.3d 1206, 1210 (10th Cir. 2013) (statute directing agency to "transmit . . . a report," 25 U.S.C. § 4044 to congressional committees described as an order for the "Secretary of the Interior to file with Congress a report") (internal quotation marks omitted).

**B.  The Inspector General cannot withhold the Semiannual Reports solely based on the Capitol Police Board's order requiring all Office of Inspector General information to be treated as "security information."**

**i.   The Capitol Police Board order cannot be read literally to mean that "all" OIG information is security information.**

The IG asserts that his hands are tied by U.S. Capitol Police Board (hereinafter "the Board") Order 17.6 (hereinafter "the Order"), which provides that "Office of Inspector General information shall not be . . . distributed outside the United States Capitol Police or Capitol Police Board," § 1(a); and that "[N]o secondary distribution of Office of Inspector General Information shall be made without prior authorization of the Capitol Police Board and the Inspector General consistent with applicable law, regulation, and policy," § 2. (Def. MSJ Ex. A.) The IG concludes that "[w]ith respect to the OIG reports requested by Plaintiffs in this litigation, the Board has not authorized their public disclosure, and those reports therefore cannot be released." (Bolton Decl. ¶ 10.) However, whether the Board has authorized the release is irrelevant to this case because the "prior authorization" language in § 2 pertains only to "secondary distribution," that is, distribution of IG information that has been provided to USCP or the Board. That language does not speak to the authority of the IG to release the material, such as the documents requested in this case, directly to a member of the public. Instead, it is only § 2 that potentially applies here, and that provision, on its face, does not even permit distribution of any "Office of Insppector General Information" under any circumstances, even with Board approval.

Consistent with law and current practice, the Order's directive that all OIG information not be distributed outside the USCP or the Board, § 1(a), should not be read as a ban on distribution by the IG of literally all OIG information. Despite the absolute language of the Order, the IG concedes that the Order must allow an exception for the disclosure of OIG information to Congress without prior authorization from the Board, citing 2 USC § 1979(c). (Bolton Decl. ¶ 9.) Framed in this way, the IG accepts the Board's assertion that all OIG information is security information and contends that the basis of disclosing OIG information to Congress is that even security information may be provided to Congress upon its request. (Bolton ¶ 9.)

23

What Defendants never address, however, is the extent to which the IG has authority to

decide that some OIG information is not security information, contrary to the Board's categorical

rule that all OIG information is security information.[4] As a matter of practice, the IG does in fact

exercise such authority. When Mr. Bolton gave public testimony to Congress about the January

6, 2021 insurrection, he explicitly stated that he was discussing the "*non-law enforcement*

*sensitive findings* detailed in my two 'Flash Reports.'" (Ex. 3 at 1) (emphasis in original) detailed

in his two reports. If the Order means what it says—that "all Office of Inspector General

information shall be considered . . . law enforcement sensitive," (Def. MSJ Ex. A) then there can

be no such thing as "non-law enforcement sensitive findings" in an OIG report. Clearly, the

practice of the USCP and the OIG is to provide the Inspector General with leeway to determine

that some OIG information is not security information.

Further, the OIG has posted to its public website Inspector General information, despite the

express prohibition of the Order that "Office of Inspector General Information . . . shall not be

posted to internal or external websites[.]" (Def. MSJ Ex. A.) On the OIG's website are four

external peer reviews, including one which post-dates the Order. *See* https://www.uscp.gov/the-

department/office-inspector-general/audits-investigations (last visited Nov. 12, 2021). Among

other things, the most recent three Peer Review Reports include a letter from the USCP IG to the

---

[4] Defendants assert that certain OIG information pertaining to the January 6, 2021 insurrection is
only publicly available because "once a document is provided to a congressional committee,
whether it is further disseminated to the public is beyond the USCP's or OIG's control." (Def.
Mem. MSJ at 13 n.4.) However, some OIG information was released to the public through a
series of press releases issued by USCP and available on its website. *See*
https://www.uscp.gov/media-center/press-releases (last visited Nov. 12, 2021).

reviewing agency which sets forth the title of the review and its ultimate conclusion (i.e., whether the office earned a "pass" rating).

Still further, while Mr. Bolton claims that his office implements the Order "by not disclosing *any* OIG information outside the USCP or the Board unless that disclosure is specifically authorized by the Board," (Bolton Decl. ¶ 9) (emphasis added) the Report Restriction Language in the Flash Report asserts that the report is the "property of the Office of Inspector General" and that no secondary distribution may be made outside the USCP or the Board "without prior authorization *by the Inspector General* or the Capitol Police Board." (Ex. 4 at 1.)

Thus, as a matter of practice, the IG exercises discretion to determine when OIG information is not security information, notwithstanding the language of the Order. There is no reason that the IG cannot exercise that same authority here. As a matter of law, the Board lacks the authority to prevent the IG for disclosing information that does not fall within the statutory definition of security information for the reasons set forth in Section II.B of this brief. Further, the Order's attempt to prohibit the IG from disclosing any OIG information turns on its head the expressed intent of Congress that "[i]t should be the default position of each OIG under the IG Act to publicly release all reports unless otherwise prevented from doing so by law." *See* S. Rep. No. 114-36 at 11 (2015), *available at* https://www.congress.gov/114/crpt/srpt36/CRPT-114srpt36.pdf (last accessed Nov. 12, 2021).

For the foregoing reasons, the IG should not be permitted to rely on the Order's literal language to avoid making a determination as to whether each SAR falls within the statutory definition of "sensitive information."

ii.    **The SARs do not consist entirely of security information as that term is defined by statute**

There is no evidence in the record that the SARs contain security information, let alone that they consist entirely of security information. The IG's declaration does not claim that he or anyone in his office has reviewed the SARs to determine if there is information that he does not consider to be security information as that term is defined in the statute. Indeed, the OIG seems to consider at least some of the information contained in the SARs as not being security information. One type of document required to be included with the SAR, "an appendix containing the results of any peer review conducted by another Office of Inspector General during the reporting period," 5 U.S.C. App. § 5(a)(14)(A) is posted to the OIG's website for the years 2010, 2013, 2016, and 2019. *See* https://www.uscp.gov/the-department/office-inspector-general/audits-investigations (last visited Nov. 12, 2021).

Further, it appears the vast majority of information in a SAR is not security information. Much of the information is not in "respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds," 2 U.S.C. § 1979(a) and still less of the information could reasonable be described as "sensitive," *id.*, with respect to these topics. Examples of information included in the SAR that does not relate to "policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response" include "statistical tables showing the total number of audit reports, inspection reports, and evaluation reports and the total dollar value of questioned costs," 5 U.S.C. App. § 5(a)(8) and "a detailed description of any attempt by the establishment to interfere with the independence of the Office, including— (A)with budget constraints designed to limit the capabilities of the Office; and (B)incidents where the establishment has resisted or

26

objected to oversight activities of the Office or restricted or significantly delayed access to information, including the justification of the establishment for such action," 5 U.S.C. App. § 5(a)(21).

At least one item included in the SAR does not qualify as security information under 2 USC § 1979(a)(1) because it does not even "relat[e] to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds." Specifically, "a list of any peer reviews conducted by the Inspector General of another Office of the Inspector General," 5 U.S.C. App. § 5(a)(16), would contain only information about an agency other than the USCP. Still other information is already public, including "a summary of . . . the prosecutions and convictions which have resulted" from referrals to prosecutive authorities. 5 U.S.C. App. § 5(a)(4).

### C.  Defendants have failed to demonstrate that any need for secrecy overcomes the presumption of a right of access to the Semiannual Reports.

The government does not explain why withholding of the SARs is justified by a need for secrecy. However, with respect to these documents, the need for secrecy is minimal and the public interest is great. Since the SARs provide background, summaries, lists, and aggregate data, rather than the details which might be found in the underlying reports, there is not an overriding need to withhold these documents in their entirety. To the extent that the SARs may contain information that is privileged or the government otherwise demonstrates a need for specific information to remain secret, such information can be redacted.

The public interest in reviewing the SARs is great. SARs inform the public about the activities of the OIG and also inform the public about waste, fraud, and abuse at the USCP. The SARs are presented in a summary form, with tables, appendices, and narratives, and therefore it is more easily digestible to the public than the raw IG reports and audits. Further, the SARs will

help the public determine whether the USCP is making timely final decisions about whether to adopt the recommendations of the OIG or is instead dragging its feet.

Finally, disclosure of the SARs will allow the public to see the quality of work that the OIG is putting into preparing the SARS. This is an issue of significant interest, particularly with respect to the USCP OIG. When first Semiannual Congressional Report was presented to Congress, one senator remarked "It is my understand there was not as much substance as we would like in your semiannual report. I would urge you to give us more detail of what you are finding and what your recommendations are. That is real important, particularly as we are focusing more on financial accountability within the Capitol Police." *See* Legislative Branch Appropriations for Fiscal Year 2008: Hearings Before a Subcommittee of the Committee on Appropriations on H.R. 2771/S.1686, 110 Cong. 115 (2007) (hereinafter "Appropriations Hearing") (Statement of Sen. Allard), S. Hrg. 110-245.

### V.   Plaintiffs have a common law right of access to Capitol Police Office of Inspector General audits and reports.

#### A.  The audits and reports are public records.

#### i.  The audits and reports are created to memorialize the activities and statements of the OIG and USCP

Plaintiffs requested "all . . . Office of the Inspector General (OIG) reports, including any audits, from the period 2008 forward." (Def. MSJ Ex. B.) Many types of reports are responsive to this request. Some examples include audits of annual financial statements created pursuant to 2 U.S.C. § 1903(b)(2); external peer review audits, four of which are posted to the USCP OIG's website[5]; and operational planning and intelligence investigative reports (Ex. 4). Given the

---

[5] https://www.uscp.gov/the-department/office-inspector-general/audits-investigations

different types of documents at issue, "[t]he court should assess separately each category of documents requested to determine whether part or all of that category might be composed of public records. If there is any legitimate question as to any or all of the categories, then the court should order a *Vaughn* index to evaluate the individual documents within these categories." *WLF I*, 17 F.3d at 1452. As explained below, the different categories of documents, and different documents within each category, involve different considerations as to whether they constitute public records.

In general, "Congress structured the OIG to promote independence and objectivity." *Truckers United for Safety v. Mead*, 251 F.3d 183, 186 (D.C. Cir. 2001). Therefore, its investigative role is not always advisory, but includes "receiv[ing] and investigat[ing] complaints or information from an employee or member of the Capitol Police concerning *the possible existence of an activity* constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to the public health and safety[.]" 2 U.S.C. § 1909. To the extent that an investigative report concerns the actions of the USCP, as opposed to the OIG, such reports may be created primarily to objectively collect and communicate facts, rather than to make recommendations. For example, the Flash Report titled "Review of Events Surrounding the January 6, 2021 Takeover of the U.S. Capitol" (Ex. 4) includes recommendations, but its purpose is not advisory. Instead, it is "designed to communicate any deficiencies with the Department's operational planning and intelligence for planned demonstrations on January 6, 2021." (Ex. 4.) Therefore, part of the report is devoted to memorializing relevant facts and existing policies, setting forth the mission of the Intelligence Operation Status as stated on the USCP's intranet, and describing the structure of the PSPB. (Ex. 4.) The report also includes in an appendix the USCP "official" timeline of events leading up to

29

the security breach. (Ex. 4.) Thus, OIG investigative reports may fairly be said to be created for the purpose of memorializing governmental actions or activity. *See Trautman v. DOJ*, 317 F. Supp. 3d 405, 413 (D.D.C. 2018) ("NARA's Office of Inspector General 'ultimately located, processed, and produced the very records that plaintiffs sought—i.e.,[] records 'memorializing' the investigation in question . . . .'"); *Drake v. Lab. Corp. of Am. Holdings*, 290 F. Supp. 2d 352, 358 n.7 (E.D.N.Y. 2003) ("DOT Inspector General's findings after investigation of Drake's drug test, memorialized in a report dated July 18, 2001").

In addition to investigative reports, the OIG prepares financial audits. A "financial audit" is not prepared to recommend corrective action, but is instead "a review of an entity's financial statements, or segments of them, for two purposes: to determine whether the statements fairly present the audited entity's financial position in accordance with generally accepted accounting principles; and to determine whether the entity has complied with legal requirements governing those transactions and events that may have a material effect on the financial statements." 2007 Md. AG LEXIS 14. The purpose of a financial audit is therefore not to provide advice or make recommendations, but merely to memorialize an OIG's conclusion about the data presented.

### ii.     The audits and reports are not preliminary material.

In preparing a report or audit, the OIG records its preliminary information-gathering activities. But that is not what is requested here. In *WLF II*, the D.C. Circuit explained that "a government auditor's *preliminary notes* used in the preparation of an official report" would not qualify as a public record, implying that the final, official report would qualify. 89 F.3d at 905. Further, financial audits have historically been made available to the public under states' common law right of access. *Nowack v. Auditor Gen.*, 219 N.W. 749, 751 (Mich. 1928) ("So, in the instant case, the plaintiff as a citizen and taxpayer has a common-law right to inspect the

public records in the auditor general's office to determine if the public money is being properly expended. It is a right that belongs to his citizenship.")

As to investigatory material, this Court has held that a subpoena does not qualify as a public record because it is "a *preliminary step* to gather information pertinent to the Committee's task of deciding whether to recommend impeachment of the President[.]" *Judicial Watch I* at 315-16. The investigatory records at issue here are not preliminary to a recommendation, but are instead compiled after all relevant information has been collected.

This Court has also held that a report prepared by a congressional committee's investigatory staff is not a public record where plaintiffs "do not allege that the [reports] memorialize or record any official action taken[.]" *Pentagen Techs. Int'l v. Comm. on Appropriations of the United States H.R.*, 20 F. Supp. 2d 41 (D.D.C. 1998). Plaintiffs in this case, however, *have* alleged that OIG reports memorialize or record governmental actions such as, for example, the USCP's official actions in responding to the January 6, 2021 insurrection. Plaintiffs have further alleged that OIG reports are an official statement of the OIG and memorialize official actions taken by that office.

The investigative report at issue in *Pentagen* also were not the final work product of the Committee, but instead were created to "assist it in the determination of matters within [the Committee's] jurisdiction[.]" *Id.* at 43. This does not describe the investigatory reports at issue here. Rather than being compiled by OIG investigatory staff to assist the IG in making a determination, Plaintiffs' request concerns only final OIG reports. Additionally, many OIG reports do not contain any recommendations at all. Indeed, there exists a category which are not required to be provided to the USCP or Congress precisely because they contain no

recommendations for corrective action. 5 U.S.C. App. § 4(e)(1). Such reports can hardly be described as advisory or preliminary since there is no decision for the USCP to make after the report is prepared and the USCP may not even see the report.

Finally, the USCP OIG has a statutory responsibility to prepare audits and reports, and file those records recommending corrective action to Congress, 2 U.S.C. § 1909(c)(1), 5 U.S.C. App. § 4(e), as well as to create an annual financial audit statement, 2 U.S.C. § 1903(b)(2). For the reasons set forth in Section IV of this brief, such statutory requirements vest the documents with legal significance and therefore remove them from the category of merely preliminary or incidental material.

### B. The Inspector General cannot withhold all audits and reports on the grounds that they contain "security information" because not all of the information contained in these documents meets the statutory definition of "security information."

As explained in Section IV.B of this brief relating to the SARs, the IG cannot blindly adhere to the Board's pronouncement that all OIG information is security information. Further, there is affirmative evidence in the record that at least some of the requested OIG documents contain non-security information which can be segregated and released.

Since the IG has relied on a blanket Board Order instead of analyzing each OIG Report, there is not a wealth of information on the record as to the structure or contents of those documents. However, in testimony to Congress, the first IG has set forth three top management challenges—"financial management, human capital, and security." Appropriations Hearing at 115 (Statement of Inspector General Hoecker). The first two of these three categories, while they may incidentally contain security information, concern only business management. An example of this type of document is the OIG's "Audit of USCP Budget Formulation Process," Report

Number OIG-2010-03 (June 2010), *appended to* U.S. Capitol Police Budget Concerns: Hearing

Before the Subcommittee on Capitol Security, 111 Cong. (2010). (Ex. 5.) The audit covered

"Inadequate Controls," "Past Processes and Practices not Followed," "Overarching Cause 'Tone

at the Top,'" "Inaccurate Salaries and Benefits Budget Submissions," and "Potential Shortfall in

the Radio Modernization Project." (Ex. 5). Nothing in this document appears to contain security

information,[6] and it has been placed on the public record in full. Commenting on the report, Rep.

Capuano stated "The issues here have nothing to do with the actual policing of the Hill. I am not

questioning you on that. These issues are administrative." *Id.* (Statement of Rep. Capuano).

As far as the OIG's work on security-related management challenges, the structure of the

OIG reports is amenable to segregating sensitive from non-sensitive information. Indeed, the

reports are specifically designed to be segregable. As the first IG explained to Congress, "[I]n

accordance with OIG's reporting protocols, the *Executive Summary*; *Objectives, Scope and*

*Methodology*; and *Body* of the report must all stand alone and can be read as separate

documents." (Ex. 5) (italics in original). An example of a security-related document that can be

segregated along these lines is the public Flash Reports made available by Congress pertain to

the events surrounding the January 6, 2021 takeover of the U.S. Capitol. (Ex. 4.) On the cover

page is the title "Flash Report: Operational Planning and Intelligence," an OIG investigation

number, and the month and year that the report was completed. This information is not sensitive

and is exactly the type of information often posted on the website of USCP OIG. (*See e.g.*, Ex. 6

at 4, available at https://www.uscp.gov/the-department/office-inspector-general/audits-

investigations).

---

[6] Exhibit 5 contains only an excerpt of the full report.

As far as the contents of the Flash Report, the publicly released version shows that there is an Executive Summary, Background, and Listing of Recommendations. (Ex. 4.) None of these sections contain detailed information about security, policing, or intelligence. The cited deficiencies and proposals to improve security and intelligence discuss the issues only in broad strokes, such as recommending that the USCP "establish policies and procedures designating the specific entity or entities responsible for overseeing the operational planning and execution process for each anticipated event." (Ex. 4.) When the IG discussed this document in his public testimony, he made clear that he did not consider this type of information to be sensitive. (Ex. 3.) Since the page numbering skips from 2 to 40 and includes an Appendix B, but not an Appendix A, it appears that a vast majority of the document was withheld. This fact demonstrates that it is possible to segregate and release information of great value to the public while withholding sensitive information, even where the sensitive information may comprise a large portion of the document.

The Executive Summary and List of Recommendations suggests that much more of the body of the report contains non-sensitive information concerning the overall structuring and policies for the organization of the USCP, as well as administrative procedures, rather than specific law enforcement or intelligence techniques. For example, recommendations include "establish[ing] policies and procedures requiring . . . standardized planning document formats" and requiring USCP employees to obtain security clearances. (Ex. 4.)

In addition to the Flash Report, there are other USCP OIG reports that contain at least some non-security information. (*See e.g.*, Ex. 5.) While the Defendants' filings do not give the titles of any OIG reports or audits, several titles are listed in the peer review reports of the USCP OIG, available by clicking on each report at https://www.uscp.gov/the-department/office-inspector-

general/audits-investigations. Among the audits, many relate to financial matters rather than policing, investigative, or intelligence matters. These include audits of the USCP's annual financial statements, a performance audit of the USCP Travel Card Program, a performance audit of the USCP Dignitary Protection Division Payroll Costs and Compliance with Annual Limitations, a performance Audit of USCP Library of Congress Division Special Events Unit Reimbursement Process, and an audit of the USCP budget formulation process. These audits do not constitute security information because they do not relate to "policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness," 2 U.S.C. § 1979(a).

Since the USCP OIG does not provide a list of titles or descriptions of OIG reports and audits, the full range and nature of the remaining documents is unknown to Plaintiffs. However, it is possible to get a sense of the types of documents created by the USCP OIG from surveying catalogues of OIG records from other law enforcement agencies.

Some law enforcement agency reports concern misconduct of employees that is unrelated to law enforcement or intelligence, such as "Findings of Misconduct by an FBI Assistant Director for Failure to Timely Report a Romantic Relationship with a Subordinate and Related Misconduct," available at https://oig.justice.gov/sites/default/files/reports/21-098.pdf (last accessed Nov. 12, 2021). This report sets forth the findings of the investigation and the conclusion that violations of FBI policy took place.

Still other law enforcement OIG documents are audits of administrative systems. For example, one FBI audit is of statistical data reporting. *See* "Audit of the Federal Bureau of Investigation's Uniform Crime Reporting System Pursuant to the Federal Information Security Modernization Act of 2014, Fiscal Year 2020," available at

https://oig.justice.gov/sites/default/files/reports/21-048.pdf (last accessed Nov. 12, 2021). Only
the summary of this audit was released because the full audited contains "information that, if
disclosed, may adversely affect information security[.]" The summary nevertheless includes
sections on the audit's objectives, results in brief, recommendations, audit approach, and
background. *Id.* The FBI's ability to segregate and withhold only sensitive material suggests that
the USCP OIG can do the same.

The OIG of the NSA, an even more clandestine agency, provides reports concerning a variety
of topics include waste of government funds. *See e.g.,* "Audit of the Agency's Travel Program,"
(47 pages), available at
https://oig.nsa.gov/Portals/71/Reports/Reviews/Final%20Travel%20Audit%20AU%2018%2000
03%20Public%20Release.pdf?ver=2019-03-01-144443-310; "Audit of Cost-Reimbursement
Contracts" (54 pages), available at
https://oig.nsa.gov/Portals/71/Reports/Reviews/Cost_Reimb_Report.pdf?ver=Ag-
RBUeqikr50aRzgALDgg%3d%3d

If a 47 page audit of the NSA's travel program can be posted to that agency's website
without revealing any sensitive information, it is unreasonable to believe that the USCP's audit
of its own travel card program (OIG-2019-12) is so sensitive that not a single page can be safely
released to the public. See
https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/Peer%20Review
%20Report%20%282019%29.pdf (listing USCP OIG reports).

The District of Columbia Metropolitan Police Department, which performs many of the same
tasks as the USCP, has published to its website OIG reports concerning "Station and Substation

Building Conditions," an audit and re-audit of the "Management of Seized and Confiscated Property/Evidence," and a special evaluation of the "Approval and Conduct of Non-Dignitary Escorts," among other topics. Available at

http://app.oig.dc.gov/news/newsLister2.asp?archived=0&mode=release&month=00000&agency =75

Some law enforcement agencies' Offices of the Inspector General create reports that pertain to investigative and intelligence techniques, but which are nevertheless posted in their entirety since they presumably do not contain sensitive information. Examples of such documents include "Management Advisory Memorandum: Notification of Concerns regarding Use of Photographs of FBI Employees for Online Undercover Operations," available at https://oig.justice.gov/reports/management-advisory-memorandum-notification-concerns-regarding-use-photographs-fbi

In short, Inspectors General evaluating law enforcement and intelligence agencies generally conduct audits and investigation on a wide range of heterogenous topics. The USCP is no different. Without knowing the topics of the USCP OIG reports or even how many there are, it is impossible to say which contain security information, as defined by the statute, and which do not. Nevertheless, the titles of several USCP OIG reports that are known to the public and the types of OIG reports produced by other law enforcement agencies make clear that at least some USCP OIG reports contain little or no security information. Further while other documents contain likely contain some security information, such as the Flash Reports, that information can be redacted so that only non-security information is released.

Additionally, the fact that over 100 of the Directives were deemed to not contain security information (Joyce Decl. ¶ 8) suggests that many of the policies and activities that might be the subject of an OIG investigation or audit would not be of a sensitive nature. For example, if USCP's policies relating to time and attendance are not security information, an investigation into an employee violation the time and attendance policy would not inherently contain security information. True, the OIG might have employed sensitive techniques in investigating the matter, but it is hardly a foregone conclusion that that is the case. The techniques of interviewing witnesses and reviewing documents are not sensitive procedures that would constitute security information.

### C.  **Defendants have failed to demonstrate that the interests of secrecy overcome the presumption of a right of access to the audits and reports.**

With respect to the OIG audits and reports, Defendants have failed to offer a substantive analysis of the need for secrecy. To the extent that Defendants' reliance on the Board's blanket order prohibiting the release of OIG information and generic concerns about the sensitivity of OIG information can be construed as arguments for secrecy of the particular documents at issue, these arguments are insufficiently detailed. *Parhat* 532 F.3d at 836.

On the other side of the balance, there is a great public interest in the OIG reports and audits. "[A]uditors/inspectors general do not have the power to compel implementation of their recommendations. Their influence lies essentially in the impact of openness and transparency, as they inform the public and public officials about existing problems and possible solutions." *ARTICLE: Governing the American Police: Wrestling with the Problems of Democracy*, 2016 U Chi Legal F 615, 647-48. As such, audits and investigative reports of Offices of the Inspector General are also typically made available to the public. 5 U.S.C. App. § 8m.

Further, specifically with respect to financial audits and any other reports involving the expenditure of money, the public has a great interest in learning about how taxpayer dollars are being spent. For example, a trial court was found to have properly released audited financial statements under the state's common law right of access in *Bergen Cnty. Improvement Auth. v. N. Jersey Media Grp., Inc.*, 851 A.2d 731 (N.J. Super. Ct. App. Div. 2004). The appellate court there explained, "[T]he public's interest in examining these financial records is self-evident. As our recitation of the facts demonstrates, there are large amounts of public funds being disbursed to procure management services for this public hospital. . . . The citizens of Bergen County and of this State have an unquestioned interest in ensuring that public funds, in the form of preferential reimbursement rates, are being spent wisely, efficiently and consistent with the Medical Center's mission."

### VI.   Plaintiffs have a statutory right to Capitol Police Office of Inspector General audits and reports which recommend corrective action.

### A.   The USCP OIG statute incorporates the requirement of the IG statute that IG reports containing a recommendation for corrective action be posted to the OIG's website.

Under 2 U.S.C. § 1909(c)(1), "The Inspector General shall carry out the same duties and responsibilities with respect to the United States Capitol Police as an Inspector General of an establishment carries out with respect to an establishment under section 4 of the Inspector General Act of 1978, (5 U.S.C. App. § 4), under the same terms and conditions which apply under such section."  Section 4 of the Inspector General Act of 1978, in turn, requires that "[i]n carrying out the duties and responsibilities established under this Act, whenever an Inspector General issues a recommendation for corrective action to the agency, the Inspector General . . . not later than 3 days after the recommendation for corrective action is submitted in final form to the head of the establishment, post the document making a recommendation for corrective action

on the website of the Office of Inspector General." 5 U.S.C. App. § 4(e)(1)(C). Therefore, a straightforward reading of these statutory provisions requires the Inspector General for the United States Capitol to post to the OIG website a copy of all final recommendations for corrective action within 3 days after they are submitted.

The government seeks to avoid this conclusion by arguing that "[b]ecause the public posting requirement did not exist when Congress in § 1909(c)(1) applied § 4 of the IG Act to the USCP IG, the USCP IG has no such duty." (Mem. MSJ at 11.) In support of its position, the government cites to *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019), in which the Supreme Court stated that "a statute that refers to another statute by specific title or section number in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted, without any subsequent amendments." The Supreme Court called this construction the "reference canon[]."

What the government fails to recognize is that the Supreme Court's analysis in *Jam* began by considering the "natural reading" of the statute at issue. The "natural reading," according to the Supreme Court was that "[i]n granting international organizations the 'same immunity' from suit 'as is enjoyed by foreign governments,' the Act seems to continuously link the immunity of international organizations to that of foreign governments, so as to ensure ongoing parity between the two." *Id.* at 768. Only then did the Supreme Court look to the reference canon to "confirm" the natural reading. *Id.* at 769 ("The more natural reading of the IOIA is confirmed by a canon of statutory interpretation that was well established when the IOIA was drafted.") The Supreme Court explained that the IOIA's reference to the immunity "enjoyed by foreign governments" is not to the concept as fixed in 1945, but rather is "an instruction to look up the

applicable rules of foreign sovereign immunity, wherever those rules may be found—the common law, the law of nations, or a statute." *Id.* at 770.

The "reference canon" is just that—a canon. It is not to be applied where the language of the statute is plain. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). ("In any event, canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'") Thus, while courts may refer to canons of construction to "confirm" that their plain reading of the statute is correct, they may not use canons of construction to override the plain language of a statute.

The Second Circuit's decision in *United States v. Chi Ping Patrick Ho*, 984 F.3d 191 (2d Cir. 2020) is illustrative. In *Ho*, the appellant argued, much like the government argues in this case, that "'Congress's specific reference to the [FCPA] in § 1956(c)(7) manifested an intention to incorporate the FCPA as it existed in 1992, when the reference was added to the statute.' Because § 78dd-3 was not a part of the FCPA until six years later, Ho argues that it is not covered by the money laundering statute." *Id.* at 201. The Second Circuit rejected this argument and distinguished the Supreme Court's holding in *Jam*, explaining, "Nothing in *Jam* compels us to depart from the ordinary meaning of § 1956's clear text or to resort to canons of construction, and we decline to do so today." *Id.* at 203. *See also id.*, *quoting N.Y. ex rel. Office of Children & Family Servs. v. United States HHS Admin. for Children & Families*, 556 F.3d 90, 92 (2nd Cir. 2009) ("Despite the statute's reference to a specific section, we nevertheless understood the text

to plainly signal Congress's intent to incorporate the full range of reasonable efforts required by §
671(a)(15)") (cleaned up).

The Seventh Circuit has similarly held that the reference canon does not create "a categorical
rule that compels courts to always read statutory cross-references as pointing to their original
targets. Indeed, such a rule would make little sense, as [w]riting a cross-reference rather than
repeating the text to be incorporated is useful precisely because the target may be amended. A
pointer permits the effect of a change in one section to propagate to other, related, sections
without rewriting all of those related sections." *United States v. Head*, 552 F.3d 640, 645-46 (7th
Cir. 2009) (internal quotation marks omitted, alteration in original).

Here, the plain and natural reading of 2 U.S.C. § 1909(c)(1) is that amendments to the IG Act
would apply to the U.S. Capitol Police OIG as well. The U.S. Capitol Police OIG statue provides
that "[t]he Inspector General shall carry out the same duties and responsibilities . . . under the
same terms and conditions which apply under such section [5 U.S.C. App. 4]." Thus, the two
sections are explicitly linked with language that ensures there are no differences between how 5
U.S.C. App. § 4 operates with respect to the U.S. Capitol Police and executive branch
establishments. Indeed, the title of this subsection is "Applicability of duties of Inspector General
of executive branch establishment." The "same duties and responsibilities" and "same terms and
conditions" language in 2 U.S.C. § 1909(c)(1) is indistinguishable from the language in the
statute at issue in *Jam*, which the Supreme Court found to require the referring statute to
incorporate future changes in the law: "The language of the IOIA more naturally lends itself to
petitioners' reading. In granting international organizations the 'same immunity' from suit 'as is
enjoyed by foreign governments,' the Act seems to continuously link the immunity of

international organizations to that of foreign governments, so as to ensure ongoing parity between the two."

The Board, for its part, seems to have understood 2 U.S.C. § 1909(c)(1) the same way as Plaintiffs. The Board's December 2017 Order (Def. MSJ Ex. A) was a direct response to Congress's amendment to the 5 U.S.C. App. § 4, which added the requirement for posting certain documents online. Congress enacted the website posting provision as part of the Inspector General Empowerment Act of 2016, P.L. 114-317, in December 2016. If the Board believed that the new provision would not apply to the USCP, there is no reason why it would have issued an order directing that "Office of Inspector General information . . . shall not be posted to internal or external websites[.]"  (Def. MSJ Ex. A.) Further, the Order was described as being issued "pursuant to the authorities provided under 2 U.S. Code § 1979 regarding the statutory authority of the Capitol Police Board to determine the release of security information." (Def. MSJ Ex. A.) This framing is consistent with an attempt to use 2 U.S. Code § 1979 as a basis for invoking subsection (e)(2) of 5 U.S.C. App. § 4 which provides the following caveat: "Nothing in this subsection shall be construed as authorizing an Inspector General to publicly disclose information otherwise prohibited from disclosure by law."

Additionally, the context of the statute as a whole suggests that Congress did not intend it to be frozen in time. Another part of 2 U.S.C. § 1909(c), paragraph 4, provides, "Neither the Capitol Police Board, the Chief of the Capitol Police, nor any other member or employee of the Capitol Police may prevent or prohibit the Inspector General from carrying out any of the duties or responsibilities assigned to the Inspector General under this section." Congress could not have intended this language to authorize interference by the Capitol Police Board with those duties or responsibilities not yet in existence as of 2005. Yet that is precisely what the Board seeks to do

43

through its Order – prohibit the IG from complying with its duty to post certain reports to its own website. In passing the IGEA, Congress was aware of such potential pressures and sought to prevent it. S. Rep. No. 114-36 at 11 ("The bill would . . . . protect an OIG from any potential pressure by an agency to withhold publication of a report.")

Adopting the government's frozen-in-time position here would also eliminate the applicability of other portions of the amended statute. For example, the IGEA also amended Section 5 to list additional information it wanted to receive from OIGs. P.L. 114-317. Since that act was passed in 2016, if the government's position were to be adopted, Congress would be depriving itself of the additional information it wanted from OIGs generally. Yet this information is important to Congress: "This information will help ensure Congress has the information it needs to perform its oversight duties of federal agencies." S. Rep. No. 114-36 at 16.

**B. The Inspector General cannot withhold the audits and reports solely based on the Capitol Police Board's order requiring all Office of Inspector General information to be treated as "security information."**

For the reasons set forth in Section II.B of this brief, the IG may not rely solely on the Capitol Police Board's order to justify withholding and must instead explain why any information deemed to be security information falls within the statutory definition of security information.

Respectfully Submitted,

__/s/ Jeffrey Light_____
Jeffrey L. Light, D.C. Bar #485360
1629 K St., NW, Suite 300
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

*Counsel for Plaintiffs*