# Exhibit 1

**2053.013**



## Directive

# Rules of Conduct

| | | | |
|---|---|---|---|
| **Directive #:** | 2053.013 | **Effective Date:** | 11/19/2012 |
| **Initiating Unit:** | Office of Professional Responsibility | **Review Date:** | 11/19/2013 |
| **CALEA:** | 1.2.7, 11.3.1, 11.3.2, 12.1.3, 26.1.1, 26.1.3, 26.1.4, 26.1.5 | | |

## Contents

Authority and Coverage ............................................... 1
Definition(s) .................................................................. 2
General Policy .............................................................. 2
Responsibilities/Procedures........................................ 2
*Category A–Duty to Obey* ...................................... 2
  Rule A1: Knowledge of Laws and Regulations ....2
  Rule A2: Conformance to Laws............................2
  Rule A3: Compliance with Directives...................2
  Rule A4: Conflicting Orders ..................................2
  Rule A5: Improper Orders.....................................2
  Rule A6: Insubordination ......................................3
  Rule A7: Truthfulness ...........................................3
*Category B–Performance of Duty* ...........................3
  Rule B1: Unsatisfactory Performance ..................3
  Rule B2: Personal Appearance ............................3
  Rule B3: Absence from Duty ................................3
  Rule B4: Reporting for Duty..................................3
  Rule B5: Carrying of Credentials and Identification
  ............................................................................3
  Rule B6: Malingering ............................................3
  Rule B7: Duty Post ...............................................4
  Rule B8: Meals and Other Relief Periods.............4
  Rule B9: Courtesy.................................................4
  Rule B10: Neglect of Duty ....................................4
  Rule B11: Use of Property and Services, and
  Inspection of Equipment and Facilities.................4
  Rule B12: Operating Vehicles ..............................4
  Rule B13: Use of Force ........................................4
  Rule B14: Use of Weapons ..................................4
  Rule B15: Arrest, Search, and Seizure.................4
  Rule B16: Treatment of Persons in Custody ........4
  Rule B17: Property and Evidence ........................4
  Rule B18: Court Appearances..............................5
  Rule B19: Response to Calls................................5
*Category C–Detrimental Conduct* ...........................5
  Rule C1: Conduct Unbecoming ............................5
  Rule C2: Discrimination and/or Harassment ........5

  Rule C3: Possession and/or Use of Drugs or a
  Controlled Substance ...........................................5
  Rule C4: Use of Alcohol .......................................5
  Rule C5: Use of Tobacco .....................................5
  Rule C6: Gifts, Gratuities, Bribes, or Rewards .....6
  Rule C7: Improper Associations ...........................6
  Rule C8: Gambling ...............................................6
  Rule C9: Communications with Criminals .............6
  Rule C10: Improper Remarks...............................6
  Rule C11: Retaliation............................................6
*Category D–Administrative Responsibilities* ...........6
  Rule D1: Off-Duty Employment ............................6
  Rule D2: Telephone..............................................6
  Rule D3: Changes in Personal Status..................6
*Category E–Miscellaneous* .....................................6
  Rule E1: Abuse of Process...................................6
  Rule E2: Improper Intervention.............................6
  Rule E3: Work Stoppage ......................................7
  Rule E4: Dissemination of Information .................7
  Rule E5: Public Statements..................................7
  Rule E6: Public Appearances...............................7
  Rule E7: Testimonials...........................................7
  Rule E8: Service of Civil Processes .....................7
  Rule E9: Reports...................................................7
  Rule E10: Compromises........................................7
*Category F–Supervisors* ..........................................7
  Rule F1: Subordinate Compliance........................7
  Rule F2: Subordinate Discipline ...........................7
  Rule F3: Subordinate Performance ......................7
  Rule F4: Subordinate Failures..............................8
Additional Information .................................................8
*Exemptions*..............................................................8
Cancellation ................................................................8
Appendices .................................................................8

## Authority and Coverage

The Chief of Police serves as the chief executive officer of the United States Capitol Police (USCP) and

**USCP001248**

1 is responsible for the day-to-day operation and
2 administration of the USCP.

3 This policy may be revised at the discretion of the
4 Chief of Police, consistent with applicable law, rule,
5 and regulation.

# 6 Definition(s)

7 **Department Rules.** A Department rule is designed to
8 cover situations in which no deviation or flexibility is
9 permitted.

10 **Intoxicant.** Alcohol, liquor, malt beverages that
11 contain alcohol, drugs or other substances which,
12 when ingested, inhaled, or absorbed, deprives an
13 individual of the ordinary use of one's senses or
14 reason.

15 **Supervisor.** An employee in the rank, or civilian
16 equivalent, of Sergeant or above, or a designated
17 supervisor.

# 18 General Policy

19 The policy of the Department is to ensure that all
20 employees, both sworn and civilian, maintain an
21 exemplary standard of personal integrity and the
22 highest professional standards of conduct in both their
23 private lives and in their official capacities. This policy
24 is embodied in the Department's Values. The
25 Department will promote adherence to professional
26 standards of integrity and ethics and foster an
27 environment that emphasizes civility and
28 professionalism.

29 The Rules contained herein are designed to serve as
30 professional standards governing employee conduct.
31 Any employee, who is found to be in violation of one or
32 more of these Rules, will be subject to such
33 disciplinary action as deemed appropriate by the Chief
34 of Police. The Department will absolve employees who
35 are found not to be in violation of Department rules,
36 administer appropriate corrective action, or defer to the
37 appropriate authority for criminal prosecution, if
38 appropriate, when improper acts are confirmed.

# 39 Responsibilities/Procedures

## 40 Category A–Duty to Obey

41 **Rule A1: Knowledge of Laws and Regulations**

42 Employees are required to know and understand all
43 applicable laws, rules, regulations, Directives, orders,
44 written procedures, etc., relevant to their official duties.

45 **Rule A2: Conformance to Laws**

46 Employees will obey all laws of the United States, the
47 District of Columbia, and any state, local, or military
48 jurisdiction in which they may be present. Employees
49 arrested or indicted for a violation of any law, other
50 than minor non-custodial traffic offenses, or
51 summoned to appear in response to a criminal
52 complaint, will immediately notify one of their
53 supervisors, who in turn will notify the Chief of Police
54 through the chain of command.

55 **Rule A3: Compliance with Directives**

56 Employees are required to obey all Departmental
57 rules, regulations, Directives, orders, policies and
58 procedures. Lawful orders from a supervisor, including
59 orders relayed from a supervisor by an employee of
60 equal or lesser rank, will be obeyed promptly.

61 **Rule A4: Conflicting Orders**

62 Should a supervisor issue an order which conflicts with
63 a previously issued order, rule, regulation or Directive,
64 the employee should respectfully call attention to the
65 conflicting order and, if not rescinded by the
66 supervisor, the order will stand and will be carried out
67 promptly. The responsibility for the order will rest with
68 the issuing supervisor and the employee will not be
69 answerable for disobedience of the previously issued
70 order.

71 **Rule A5: Improper Orders**

72 Supervisors will not issue any order which they know,
73 or should know, would require a subordinate to commit
74 any illegal or unethical acts. Employees will not obey
75 any order which they know, or believe, would require
76 them to commit illegal or unethical acts. If in doubt as
77 to an order being illegal or unethical, employees will
78 respectfully request the issuing supervisor to clarify the
79 order or to confer with higher authority.

**Rule A6: Insubordination**

Employees will not refuse to obey, by words or actions, any lawful order of a supervisor, and will not utter any disrespectful, rebellious, insolent, or abusive language to or toward a supervisor.

**Rule A7: Truthfulness**

Employees will make truthful statements at all times, written or verbal, pertaining to official duties or matters affecting the Department. Employees are required to cooperate fully and truthfully during Department investigations.

## Category B—Performance of Duty

**Rule B1: Unsatisfactory Performance**

Employees will maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions. Employees will perform their duties in a manner which will maintain the highest standards of efficiency and integrity in carrying out the functions and objectives of the Department. Unsatisfactory performance may be demonstrated by, but will not be limited to:

1. A lack of knowledge of the application of laws required to be enforced.

2. An unwillingness or inability to perform assigned tasks.

3. The failure to conform to work standards established for the respective ranks, grades, or positions.

4. The failure to take appropriate action on the occasion of a crime, disruption, or other condition deserving police attention.

5. Repeated poor evaluations or a written record of repeated infractions of the rules, regulations, Directives or orders of the Department.

6. Repeated sustained complaints of misconduct.

**Rule B2: Personal Appearance**

Employees will maintain a neat, well-groomed appearance and comply with all Department policies pertaining to uniforms, civilian attire, appearance, and grooming.

**Rule B3: Absence from Duty**

Employees who fail to appear for duty at the date, time, and place specified without consent of a supervisor are "Absent Without Leave".

**Rule B4: Reporting for Duty**

Employees will report for duty on time, and at the time and place required, or they will be tardy. They will be properly equipped and cognizant of information required for the proper performance of duty so that they may immediately assume their duties.

**Rule B5: Carrying of Credentials and Identification**

1. Sworn employees will carry their Department credentials on their person at all times while on duty, and while off duty when carrying the issued handgun, except when impractical or dangerous to their safety or pursuant to an authorized investigation.

2. Civilian employees will carry their identification while on duty, display the ID upon request, and furnish their name when requested while on duty.

3. Sworn employees will promptly furnish their name and Personal Identification Number (PIN) to any person requesting that information when they are on duty or while conducting themselves in or representing themselves as acting in an official capacity, except when the withholding of such information is necessary for the performance of duty, authorized by a supervisor, or necessary to protect the employee's safety or the integrity of an authorized investigation.

4. Employees will not lend their badges, credentials, or identification to any other person.

**Rule B6: Malingering**

Employees will not feign illness or injury, falsely report themselves or others ill or injured, or otherwise deceive or attempt to deceive any supervisor of the Department, or any other governmental agency or individual authorized to conduct such an inquiry, as to the condition of their health or the health of others.

**Rule B7: Duty Post**

Employees will assume their assigned duty post without unnecessary delay. Employees will not leave their assigned duty post during a tour of duty, or at the conclusion of their tour of duty, except when properly relieved or authorized by a supervisor, and will then proceed immediately to their next assignment or to the area and/or supervisor designated for check out or reassignment.

**Rule B8: Meals and Other Relief Periods**

Employees will be permitted to suspend patrol or other assigned activity, subject to immediate recall, for the purpose of relief or having meals during their tour of duty, but only for such period of time, and at such time and place, as may be established by a supervisor.

**Rule B9: Courtesy**

Employees will be polite, courteous and respectful to all persons at all times. Employees will be tactful, friendly, helpful and understanding in the performance of their assigned duties, control their tempers, exercise the utmost patience and discretion, and not engage in argumentative discussion even in the face of extreme provocation. In the performance of their duties, employees will not use coarse, violent, profane, or insolent language or gestures, will not intimidate, and will not express any prejudice concerning race, religion, gender, politics, national origin, lifestyle, age, disabilities, or other personal characteristics.

**Rule B10: Neglect of Duty**

Employees will devote their full time and attention to the performance of their duties at all times while on duty.

**Rule B11: Use of Property and Services, and Inspection of Equipment and Facilities**

Employees will use the equipment, supplies, services and facilities of or under the care of the Department only for their intended purpose, in accordance with established procedures, and will not abuse or purposely damage such equipment or facilities. All facilities and equipment of or under the care of the Department and/or issued to employees such as desks, vehicles, computers, uniforms, etc., and their contents, will be maintained in proper order, and are subject to inspection at any time with or without prior notice, as directed by the Chief or designee.

**Rule B12: Operating Vehicles**

Employees will operate official vehicles in a careful and prudent manner, and will obey all laws, rules, regulations, Directives and orders of the Department pertaining to such operation. The suspension, expiration or revocation of an employee's driver's license or operator's permit will be reported immediately to such employee's supervisor.

**Rule B13: Use of Force**

Sworn employees will use only such force in any situation that is reasonably necessary under the circumstances, in accordance with applicable laws and the established procedures and training of the Department.

**Rule B14: Use of Weapons**

Sworn employees will not discharge any firearm, nor use or handle any weapon, in a careless or imprudent manner. Sworn employees will carry, store, secure and/or use all firearms and weapons in accordance with applicable laws and the established procedures of the Department.

**Rule B15: Arrest, Search, and Seizure**

Every arrest, search, and seizure will be in accordance with applicable laws and the established procedures of the Department.

**Rule B16: Treatment of Persons in Custody**

Sworn employees will not mistreat persons who are in their custody, and will handle persons in custody in accordance with applicable laws and the established procedures of the Department.

**Rule B17: Property and Evidence**

Property or evidence which has been discovered, gathered, or received in connection with the responsibilities of the Department will be processed in accordance with established Department procedures. Employees will not convert to their own use (or that of another party), manufacture, conceal, falsify, destroy, remove, tamper with, or withhold any property or evidence in connection with an investigation or other police action, except in accordance with established procedures.

USCP001251

**Rule B18: Court Appearances**

Employees who are subpoenaed, summoned, or otherwise requested to appear and/or testify in a court or hearing of any jurisdiction, in their capacity as a law enforcement officer or in matters pertaining to the Department, including any administrative hearing, will immediately notify their supervisor and then comply with the Directive to appear.

**Rule B19: Response to Calls**

Employees who are assigned radio communications, cell phones, pagers, or other communications equipment will keep said equipment turned on and on the appropriate channel at all times while on duty or on call, unless authorized by the employee's supervisor to do otherwise. Employees will promptly respond to all communications directed to them.

# Category C—Detrimental Conduct

**Rule C1: Conduct Unbecoming**

Employees will conduct themselves at all times, both on and off duty, in such a manner as to reflect favorably on the Department. Conduct Unbecoming will include that which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department; impairs the operation or efficiency of the Department or the employee; and is prejudicial to the reputation and good order of the Department.

**Rule C2: Discrimination and/or Harassment**

Employees will not discriminate against and/or harass any other person on the basis of race, color, national origin, religion, gender, age, sexual orientation, disability, or any other basis prohibited by law or Departmental Directive.

**Rule C3: Possession and/or Use of Drugs or a Controlled Substance**

1. Employees will not possess or use any narcotic, illegal stimulant, or other controlled substance except when prescribed for their personal treatment by a licensed health care provider authorized to dispense a controlled substance during the course of professional practice.

2. Employees will not report for duty, be on duty, or when subject to emergency recall, while under the influence of any illegal drug, narcotic or stimulant or controlled substance, whether or not prescribed by a licensed health care provider, unless medically cleared for duty.

**Rule C4: Use of Alcohol**

1. Employees will not use or consume alcohol or other intoxicants while on duty, or when subject to emergency recall (such as while on official travel), except as permitted by specific orders of a Department supervisor.

2. Employees will not report for duty, or be on duty, while impaired or under the influence of an intoxicant, or with an odor of alcohol or other intoxicant on their breath or about their person. The odor of an alcoholic beverage on the breath (as substantiated by a supervisor and at least one other individual) will be considered presumptive evidence of drinking while on duty.

3. Sworn employees will not exercise any police authority, operate any USCP-issued mode of transportation, take any official police action, or represent themselves as a police officer while impaired by, or under the influence of, alcohol or other intoxicants.

4. Sworn employees will not consume alcohol or other intoxicants while carrying a firearm.

5. When off-duty, employees will not wear in public any clothing items identifiable with the USCP when consuming alcohol or other intoxicants. This includes but is not limited to, USCP caps, t-shirts, jackets, uniform shirts, etc.

6. When off duty, employees will refrain from consuming alcohol or other intoxicants to the extent that it results in behavior which may discredit the Department, renders the employee unfit to report for the next assigned or regular tour of duty, or adversely affects the employee's work performance or the safety of the employee and/or others.

**Rule C5: Use of Tobacco**

Employees will use tobacco only in accordance with the policies of the Department.

**Rule C6: Gifts, Gratuities, Bribes, or Rewards**

Employees will not solicit or accept from any person,
business, or organization, any gift (including money,
tangible or intangible personal property, food,
beverage, loan, promise, service, or entertainment) for
the benefit of any employee or any other person,
which may give the appearance that such solicitation
or acceptance is in return for being influenced in the
performance of any official act, or being induced to do
or omit to do any act in violation of their duty.

**Rule C7: Improper Associations**

Employees will avoid regular or continuous
associations or dealings with persons whom they
know, or should know, are persons under criminal
investigation or indictment, or who have a reputation in
the community or the Department for present
involvement in felonious or criminal behavior, except
as necessary in the performance of official duties, or
where unavoidable because of immediate familial
relationships.

**Rule C8: Gambling**

Employees will not engage or participate in any form of
illegal gambling at any time, except in the performance
of duty and while acting under proper authorization
from a supervisor.

**Rule C9: Communications with Criminals   -**

Employees will not communicate verbally or in writing,
directly or indirectly, in any manner or form, any
information that may enable persons engaged in,
suspected of, or guilty of, criminal acts to escape
arrest or punishment, or which may permit them to
dispose of or conceal any money, goods, or other
evidence unlawfully obtained or possessed.

**Rule C10: Improper Remarks**

Employees will not make malicious, harassing,
untruthful, or frivolous remarks or rumors against, or
about, other members of the Department or individuals
in the workplace.

**Rule C11: Retaliation**

Employees will not harass, ridicule or retaliate in any
form against a complainant, employee, or any witness
for complaining or otherwise offering evidence in an

internal or external, criminal or administrative
investigation.

## Category D—Administrative Responsibilities

**Rule D1: Off-Duty Employment**

Employees may engage in off-duty employment only in
accordance with established Department policies and
procedures.

**Rule D2: Telephone**

Employees will have and maintain in operation a
working telephone number through which they may be
directly contacted by the Department at all times.
Employees will inform the Department of their
telephone number, and will immediately report any
change of telephone number in accordance with
established procedures.

**Rule D3: Changes in Personal Status**

Employees will report any change in personal status,
including residence address or next of kin notification,
in accordance with established procedures.

## Category E—Miscellaneous

**Rule E1: Abuse of Process**

Employees will not intentionally manufacture, tamper
with, falsify, destroy, or withhold evidence or
information, nor make any false accusations,
statements or complaints regarding a criminal charge,
traffic offense, or administrative violation.

**Rule E2: Improper Intervention**

Employees will not interfere with official business
being handled by other employees or any other
government agency unless ordered to intervene by a
supervisor, or the intervening employee reasonably
believes that a manifest injustice would result from
failure to take immediate action. Employees will not
undertake any investigation or other official action not
part of their regular duties without obtaining permission
from competent authority unless the exigencies of the
situation require immediate action.

USCP001253

**Rule E3: Work Stoppage**

Employees will not engage in any work stoppage. This includes the concerted failure to report for duty, willful absence from one's position, unauthorized holidays, or the abandonment in whole or in part of the full, faithful, and proper performance of the duties of employment for the purpose of protesting, inducing, influencing, or coercing change in conditions, compensation, rights, privileges, or obligations of employment.

**Rule E4: Dissemination of Information**

Employees will treat the official business of the Department as restricted, and are prohibited from disseminating information concerning Department investigations or operations to any unauthorized person, in accordance with established Department procedures. Employees are prohibited from providing information obtained from the Criminal Justice Information System (CJIS), Motor Vehicle Administration (MVA), Washington Area Law Enforcement System (WALES), National Crime Information Center (NCIC), or any other source to any unauthorized person, except in the performance of their duties and in accordance with proper procedures and law.

**Rule E5: Public Statements**

Employees will not publicly criticize or ridicule the Department, its policies, or other employees by speech, writing, or other expression, where such speech, writing, or other expression is unlawful, violates Department policies regarding the dissemination of sensitive and/or confidential information, or is made with reckless disregard for truth.

**Rule E6: Public Appearances**

Employees will not purport to represent the Department by addressing public gatherings, appearing on radio or television, lecturing on "law enforcement" or other related subjects, preparing any articles for print or electronic publication, acting as a correspondent to a newspaper, periodical or electronic media, releasing or divulging investigative information or any other material regarding matters of the Department without prior approval from the Chief of Police.

**Rule E7: Testimonials**

Employees will not permit their names or photographs indicating their association with the United States Capitol Police to be used in any commercial, political, or other testimonial which alludes to their position or employment without the approval of the Chief of Police.

**Rule E8: Service of Civil Processes**

Sworn employees will not serve civil processes or take part in any such service.

**Rule E9: Reports**

Employees will submit all necessary reports in accordance with established Department procedures. Reports will be truthful, accurate, complete and timely.

**Rule E10: Compromises**

Employees are prohibited from becoming involved, in any way, in an attempt to make a compromise or arrangement between suspected criminal violators and their alleged victims.

# Category F—Supervisors

**Rule F1: Subordinate Compliance**

Supervisors will be responsible for subordinates' adherence to Department rules, regulations, policies, procedures, orders and Directives, and will take reasonable action to ensure compliance.

**Rule F2: Subordinate Discipline**

Supervisors will be responsible and accountable for the maintenance of discipline and will provide leadership, supervision and example to ensure the efficiency and integrity of Department operations.

**Rule F3: Subordinate Performance**

Supervisors will be responsible for the job performance of all subordinates placed under them. Authority and functions may be delegated to subordinates, but responsibility for the accomplishment of overall Department objectives remains with the supervisor who made the assignment.

**Rule F4: Subordinate Failures**

Supervisors will be responsible and held accountable for all job-related failures on the part of their subordinates when the supervisor was aware, or should reasonably have been aware, of the failure or potential for failure, and did not take the appropriate action to correct or prevent the deficiency.

# Additional Information

## Exemptions

In certain instances, the Chief of Police may exempt individuals or units from complying with specific rules contained in this Directive. Such exemptions will be made on a case-by-case basis in recognition of individual or unit requirements for the performance of their duties.

# Cancellation

This Directive cancels Operational Directive PRF 1.3, "Rules of Conduct," issued August 23, 2000, and supersedes and replaces any related Department publication consistent with applicable law, rule, or regulation.

# Appendices

None.

**Thomas P. Reynolds**
**Acting Chief of Police**

USCP001255

# Exhibit 2

# Publication of MPD Orders on the Internet



**Recommendation of the**

**Police Complaints Board**

**to**

**Mayor Anthony A. Williams,
The Council of the District of Columbia, and
Chief of Police Charles H. Ramsey**

**July 14, 2005**

**Police Complaints Board**

**Maria-Cristina Fernández, Chair
Dr. Patricia Fisher
Michael Sainte-Andress
Marc Schindler**

730 11th Street, N.W., Suite 500
Washington D.C.  20001
(202) 727-3838
Website:  policecomplaints.dc.gov

## I.    INTRODUCTION

The Metropolitan Police Department (MPD) uses a "directive system" to issue departmental policies, procedures, and other information.  The components of the system include MPD's general orders (GO) and special orders (SO).  These orders set forth policies and procedures regarding a wide range of MPD activities, many of which involve encounters with citizens, from "Conduct Toward the Public" (GO 201.26, Part I, Section C) to requirements for officers conducting stops of individuals and frisking them (GO 304.10).  Currently, MPD's general and special orders are not available to the public, except through Freedom of Information Act (FOIA) requests.  The Department's website does not contain the orders.  The Police Complaints Board (PCB), consistent with its policy review function,[1] recommends that MPD post all of its orders, and a corresponding index, on the MPD website.

## II.    BEST PRACTICES

MPD would not be the first department to make its policies and guidelines fully available to the public.  In 2001, the Seattle Police Department Office of Professional Accountability (OPA) recommended that the Seattle Police Department (SPD) publish its entire department manual on the World Wide Web.  Chief Gil Kerlikowske of the SPD "readily agreed and directed the posting."[2]

As a result of that decision, SPD was praised by an expert in police accountability, Professor Samuel Walker of the University of Nebraska at Omaha.  In *The New World of Police Accountability*, Professor Walker recognized SPD for bucking the traditional "attitude of secrecy" that "not only denies to the public basic information about official police policies, but aggravates community relations by sending a message to people that they have no right to know how the department operates."[3]  Some major cities whose police departments have made their policies and procedures available online include the following:

- Seattle, WA[4]

---

[1]  PCB "shall, where appropriate, make recommendations to [the Mayor, the Council, and the Chief of MPD] concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  D.C. Official Code § 5-1104(d).  PCB would like to acknowledge the assistance of the Office of Police Complaints (OPC), which is overseen by PCB, in preparing this recommendation under the guidance of the agency's executive director, Philip K. Eure, and deputy director, Thomas E. Sharp.  OPC's summer law clerk, Thomas Moir, who is enrolled at the George Washington University Law School, performed research and provided other valuable assistance.

[2]  Seattle Police Department Office of Professional Accountability, *OPA's Role in Policy Review and Risk Management at SPD*  8 n.4 (2004).  Available at http://www.ci.seattle.wa.us/police/opa/Default.htm.

[3]  Samuel Walker, *The New World of Police Accountability* 190 (2004).

[4]  The Seattle Police Department's orders are available at: http://www.cityofseattle.net/police/publications/.

- Minneapolis, MN[5]

- Denver, CO[6]

- Colorado Springs, CO[7]

- Cincinnati, OH[8]

- Portland, OR[9]

OPA has seen tangible benefits from SPD's publication of its manual on the Internet.  Media inquiries into police conduct have been more informed, as have community interactions with OPA, because the public and news outlets can develop a better sense of how the department operates prior to contacting OPA or SPD.  When the situation allows, OPA can direct citizens to the website for examination of relevant policies at their convenience.  Community outreach is made more meaningful by the ability to reference the publicly available manual.[10]

MPD's orders are not restricted documents; any citizen can request copies of most, if not all, orders under the auspices of FOIA.[11]  Routing such requests through FOIA, however, creates extra paperwork, adds unnecessary cost and labor, and decreases the likelihood that citizens will inquire into the policies of their police department when, in fact, they have every right to do so.  Posting the orders on MPD's website would eliminate the FOIA "middleman," allowing citizens to review MPD policies that affect their encounters with police officers, such as stop-and-frisk procedures (GO 304.10), the taking of traffic accident (GO 401.03) and missing persons (GO 304.03) reports, issuing traffic tickets (GO 303.1), traffic enforcement (GO 303.1), use of oleoresin capsicum or

---

[5]  The Minneapolis Police Department's orders are available at: http://www.ci.minneapolis.mn.us/mpdpolicy.

[6]  The Denver Police Department's orders are available at: http://198.202.202.66/Police/template311677.asp.

[7]  The Colorado Springs Police Department's orders are available at: http://www.springsgov.com/Page.asp?NavID=1472.

[8]  The Cincinnati Police Department's orders are available at:  http://www.cincinnati-oh.gov/police/pages/-5109-/.

[9]  The Portland Police Bureau's orders are available at: http://www.portlandonline.com/police/index.cfm?c=29867.  Other notable cities include Olympia, WA, and Iowa City, IA.

[10]  Conversation with Sam Pailca, director of OPA, June 21, 2005.

[11]  The orders are also available for sale from Laborcops.com, a "professional organization of attorneys and labor consultants who are experienced in representing law enforcement unions," at http://www.laborcops.com.  PCB believes that the public should not have to seek out and pay a third party for access to police policies that could be posted on the Internet at virtually no cost to the government.

"pepper" spray (GO 901.04), and the processing of persons with mental illness (GO 308.4).

The publication of the orders on the Department's website would also be consistent with MPD's goal to ensure the online availability of the orders to its own employees.  As PCB understands it, MPD is currently in the process of revising and updating the Department's orders and directives, which MPD then intends to make available online to its employees.  PCB further understands that MPD first wants to make the materials available online to its own employees before considering public access on the Internet.  As far back as 1998, a special committee of the Council of the District of Columbia had recommended that MPD "investigate the possibility of making the General Orders accessible by mobile digital computer.  The current three-volume set of the General Orders is much too bulky to be of any use to the officer in the field.  By placing the General Orders online, officers can take advantage of their guidance as the need arises."[12]  While the fulfillment of MPD's goal to allow employees to have online access to the Department's directives will be an important step forward, PCB cannot think of any legitimate reason why citizens and police officers alike should not have the same online access to these materials right from the start, given the benefits to both groups.

The publication of the orders on the Department's website would also provide a showcase for MPD's development of model use-of-force policies and other "best practices" policies.  Because of the increasing use of the Internet, other police departments would be able to improve their own policies by considering those of MPD, and vice-versa should other departments follow suit by also publishing their directives online.  The result would be to promote best practices and greater accountability in law enforcement within the District and beyond.

## III.    RECOMMENDATION

PCB recommends that MPD publish its orders and directives, including an index, on the MPD website.  Publication of the orders in a conspicuous manner would signal that MPD respects and values the community's interest in a cooperative, mutually-beneficial relationship between citizens and police.  MPD has already taken important steps toward openness on its website, which contains information about how citizens can file complaints against the police, including a link to OPC's website, helpful information on a wide range of MPD programs, and a comprehensive "newsroom."  PCB believes that MPD should extend that openness by making its orders and directives more accessible to the public.

---

[12]   Council of the District of Columbia, *Report of the Special Committee on Police Misconduct and Personnel Management of the Council of the District of Columbia*  35 (1998).

# Exhibit 3

STATEMENT OF INSPECTOR GENERAL MICHAEL A. BOLTON
UNITED STATES CAPITOL POLICE
OFFICE OF INSPECTOR GENERAL


Committee on House Administration
United States House of Representatives
April 15, 2021


Good afternoon, my name is Michael A. Bolton.  I am the Inspector General for the
United States Capitol Police (USCP or Department).  I have been with the Inspector General's
office since 2006. In January 2019, the Capitol Police Board appointed me as the Inspector
General. Thank you for this opportunity to appear before you, the Committee on House
Administration, to discuss our Review of Events in regards to USCP's Departmental Operation,
Programs and Policies that were in effect during January 6, 2021.


I would like to extend my appreciation to the Committee for holding this hearing. This
hearing is different in many ways. I am addressing not only Committee members exercising their
Constitutional Role of Oversight, but I am testifying to witnesses, as well as, survivors who are
affected by the events of January 6, 2021. On January 6, 2021, a physical security breach of the
U.S. Capitol Building occurred during a Joint Session of Congress to certify the Electoral
College vote.  My goal is to provide each of you with a better understanding of how the events of
January 6, 2021 occurred in relation to the preparation and response of the Department. Other
factors were involved and other entities are reviewing those aspects outside of USCP. I will
discuss the non-law enforcement sensitive findings detailed in my two "Flash Reports."  I would
be happy to answer any law enforcement sensitive questions in a "closed door" setting.


Shortly after the events of January 6th, I notified the Department, Board and the
Committees that my office would be suspending all future projects listed in the Office of
Inspector General (OIG) Annual Plan for 2021 to allow my entire staff to conduct a full review
of these events. In order to accomplish this goal, both OIG Audit and Investigations, would
combine their collective talents to achieve a complete review of the Department.  In addition to

1

my staff, I brought on two additional contractors with the expertise and knowledge to assist my Office. A retired Deputy Assistant Director for the United States Secret Service and a retired Senior Special Agent Chief of the Federal Bureau of Investigation (FBI).

We did not design or intend our reports to cast blame on any one individual or group. OIG intends these reports to be an independent objective review of the Department's programs and operations to better protect the Capitol Complex, members, staff, visitors, and the rank and file officers, who have shown their commitment and bravery each and every day by keeping all safe. USCP must undertake a collective effort, to ensure that each and every officer, when their shift is over, gets to go home to their families. As well as the safety of those who work and visit the first branch of government.

In accordance with our statutory authority Public Law (P.L.) 109-55, the USCP Office of Inspector General began a review of the operations and programs that were in place prior to and during the takeover of the U.S. Capitol on January 6, 2021. Our objective, for this review, is to determine if the Department (1) established adequate measures for ensuring the safety and security of Members of Congress, their Staff and the Capitol Complex, (2) established adequate internal controls and processes that complied with Department policies and procedures and, (3) complied with applicable laws and regulations. The scope included reviewing the controls, processes, and operations surrounding the security measures prior to the planned demonstrations and the response during the takeover of the Capitol building. We made our recommendations by conducting interviews, document reviews, the combined knowledge and expertise of my staff and following best practices throughout the Federal Government of those relevant agencies with similar functions of the Department.

We are currently providing the Department, Board and Committees, a series of flash reports every 30 days. We are reviewing selected elements within the Department, noting any areas for improvement. We are providing any corresponding recommendations to compel the Department to move towards a Protective Agency as opposed to a Police Agency. At the time of this hearing, my office has completed two flash reports. The first report was a review of operational planning for January 6th including a review of the Intelligence gathering process

required for the operational plan that related to January 6th.  Our second flash report focused on the Civil Disturbance Unit (CDU) and the Department's intelligence operations as a whole.  OIG will issue our third flas report on April 30th, which will be focusing on threat assessment and the counter-surveillance unit.  We anticipated our comprehensive Review would extend for the remainder of FY 2021.  Other areas of our reviews will include, but will not be limited to: Reviews of Containment Emergency Response Team (CERT), which in previous testimony was referred to as SWAT. That term is inaccurate in that SWAT is a Police term as opposed to a Protective function or tactical team supporting the Departments mandate to protect the Capitol Complex, Members, staff and visitors.  Additional reviews will include Manpower usage (communication, makeup and structure of the command staff), Training, Security Services Bureau, K-9. Essentially every element or component that played a major role in the events of January 6th.

As our work continues, my office sees continuing areas in our findings that USCP needs address.  Those areas are Intelligence, Training, Operational Planning, and culture change.  In regards to culture change, we see that the Department needs to move away from the thought process as a traditional Police Department and move to the posture as a Protective Agency.  A police department is a reactive force. A crime is committed; police respond and make an arrest. Whereas, a Protective Agency is postured to being proactive to prevent events such as January 6th.

OIG designed our first flash report to communicate any deficiencies with the Department's operational planning and intelligence for planned demonstrations on January 6, 2021.  The deficiencies included the following (a) lack of a comprehensive operational plan or adequate guidance for operational planning, (b) failure to disseminate relevant information obtained from outside sources, (c) lack of consensus on the interpretation of threat analyses, (d) dissemination of conflicting intelligence, and (e) lack of security clearances.

In order to improve its operational planning capabilities, USCP should implement detailed guidance for operational planning.  The guidance should include policies and procedures that designate the entity or entities responsible for overseeing the operational planning and

3

execution process, require documentation of supervisory review and approval, and standardize planning document formats.  All Department employees should be required to obtain and maintain a security clearance as a condition of employment.  Guidance should also require that individual units develop plans and coordinate those plans with other units for a comprehensive, Department-wide effort.  Additionally, the guidance should communicate when specific operational planning documents are required.  For, example the Department could use a multi-tiered system based on the anticipated size and scope of an event as criteria for determining the required level of operational planning documentation it needs to prepare.

Implementing formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders would improve USCP ability to effectively disseminate intelligence throughout the Department.  Providing additional training to personnel on how to better understand intelligence assessments and an increased role for Department entities that have intelligence analysis and dissemination responsibilities in operational planning would also improve USCP ability to achieve a consensus on threat analyses. Furthermore, the Department should require supervisory review and approval for intelligence products to ensure the Department supports products  with relevant intelligence information and ensures internal consistency.  Lastly, receiving classified briefings on emerging threats and tactics would better prepare the Department's sworn and operational civilian employees to identify and counter threats and tactics in the field.

The Department lacked adequate guidance for operational planning.  USCP did not have policies and procedures in place that communicated which personnel were responsible for operational planning, what type of operational planning documents its personnel should prepare, nor when its personnel should prepare operational planning documents.  Additionally, USCP lacked guidance requiring that its various entities coordinate their planning efforts into a comprehensive plan.

Interviews with Department officials revealed inconsistencies in the types of planning documents USCP should have prepared for January 6, 2021.  Former Chief of Police Steven Sund stated the Department used documents commonly referred to as a "Plan of Action" for

large events and that such a Plan of Action signed by an Assistant Chief should have existed for the events of January 6, 2021.  Former Chief Sund also stated that the Commander of the Uniformed Services Bureau's Capitol Division should have completed an "Incident Action Plan" for the Joint Session of Congress. Former Chief Sund stated that he believed there were Department policies addressing those planning documents.  However, we could not find any policies that clearly addressed creation of those specific planning documents.

According to the Operational Services Bureau (OSB) official responsible for preparing the *CDU Plan*, prior to the summer of 2020 there were no formal planning documents for CDU events. After protest activity during the summer of 2020, OSB began utilizing a planning document from the International Association of Chiefs of Police as a guide for creating such a plan.  The official stated that OSB forwards a CDU Operational Plan by email to an Assistant Chief for approval and OSB receives a confirmation with no correspondence log or other documented approval.  Certain CDU commanders provide input to the plan but OSB does not distribute the plan to any other Department commanders. Several Department officials stated that they were not familiar with the *CDU Operational Plan* for January 6, 2021.

USCP failed to disseminate relevant information obtained from outside sources, lacked consensus on the interpretation of threat analyses, and disseminated conflicting intelligence information regarding planned events for January 6, 2021.  Additionally, the Department did not require that all of its sworn and operational civilian employees obtain security clearances.

USCP failed to disseminate relevant information obtained from outside sources regarding planned events for January 6, 2021.  According to the Department's timeline, on January 5, 2021, at approximately 7 p.m. to 8 p.m., a USCP task force agent embedded with the FBI emailed the Intelligence Operations Section (IOS) a memorandum from the FBI Norfolk Division providing additional details regarding the January 6, 2021, event.

The Acting Assistant Chief of Police for Protective and Intelligence Operations stated that the memorandum was a "Situational Information Report," which he viewed differently than an Intelligence Assessment because Situational Information Reports are not necessarily

authenticated or followed-up; the FBI produces them to communicate something its agents saw or learned.  The Acting Assistant Chief acknowledged it was hard to view it that way after January 6, 2021.  The Acting Assistant Chief also stated that to his knowledge the FBI never formally sent the memorandum to USCP.  The FBI Norfolk Division produced the document, and placed it on an FBI intranet or other internal system.  Late in the evening on January 5, 2021, a USCP task force officer (TFO) assigned to the FBI Guardian Squad Task Force pulled the memorandum from the FBI system and emailed it to a USCP IOS email distribution list.

According to an Acting Assistant Chief, the memorandum did not surface again until the Intelligence and Interagency Coordination Division (IICD) attached it to an information package sent out late on January 6, 2021, after the security breach occurred.  In the days following January 6, 2021, the memorandum began to surface in the media and Members of Congress began to ask USCP if it had received it.  The Department was originally under the impression that it had not received the document until a Department official inquired with USCP's TFOs about it.  An Acting Assistant Chief stated that to his knowledge, prior to the events of January 6, 2021, the memorandum did not make it out of the IOS email distribution list to IICD or other Department commanders. In their statements to OIG, former Chief Sund, Acting Chief Pittman and the Director of IICD stated they did not see the FBI bulletin prior to January 6th.

According to an Acting Assistant Chief, after January 6, 2021, the FBI produced a similar situational report about a threat to the State of the Union, but USCP received that report through its formal channels with the Joint Terrorism Task Force executive board, which includes the Acting Assistant Chief and Acting Chief Pittman.  As of February 11, 2021, PSB requires that all reports or concerns must be sent to the Investigations Division as well as IICD Commanders— which was not required or always happening before January 6, 2021.  Implementing formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders would significantly improve the ability of USCP to effectively disseminate intelligence throughout the Department.

Interviews with USCP officials revealed a lack of consensus about whether intelligence information regarding planned events on January 6, 2021, actually indicated specific known

threats to the Joint Session of Congress. Certain officials believed USCP intelligence products indicated there may be threats but did not identify anything specific, while other officials believed it would be inaccurate to state that there were no known specific threats to the Joint Session based on those same USCP intelligence products.

The threat analysis in the *CDU Operational Plan* for January 6, 2021, dated January 5, 2021, states, "At this time there are no specific known threats related to the Joint Session of Congress – Electoral College Vote Certification." While a prior version of Special Event Assessment 21-A-0468, dated December 16, 2020, contains the exact same statement and updated versions of the assessment published later that month contain similar language, the final version dated January 3, 2021, does not contain that statement. The IICD Director stated that IICD periodically revised the assessment as it received more information, and IICD updated the final version based on concerns communicated by the Department's law enforcement partners. An OSB official responsible for preparing the *CDU Operational Plan* dated January 5, 2021, admitted it was most likely an error on their part that the Department did not update the threat analysis in the plan.  However, multiple Department officials with intelligence dissemination responsibilities stated they had never even seen the threat analysis included in the *CDU Operational Plan* dated January 5, 2021.

Providing additional training to personnel on how to better understand and interpret intelligence assessments and requiring that any threat analyses included in operational planning are coordinated with Department entities with intelligence analysis and dissemination responsibilities would improve USCP ability to achieve a consensus on its threat analyses.

Our second flash report communicated deficiencies with the Department's CDU and intelligence operations. As part of our review, OIG also conducted a follow-up analysis of the Department's implementation of recommendations contained in *Follow-up Analysis of the United States Capitol Police Intelligence Analysis Division*, Investigative Number 2018-I-0008, dated March 2019, to confirm the Department took the corrective actions in implementing the recommendations.

USCP did not have adequate policies and procedures for CDU defining its responsibilities, duties, composition, equipment, and training.   CDU was operating at a decreased level of readiness because of a lack of standards for equipment, deficiencies noted from the events of January 6, 2021, a lapse in certain certifications, an inaccurate CDU roster, staffing concerns for the unit, a lack of properly performed quarterly audits, and property inventories not in compliance with guidance.

The Department should implement detailed policies and procedures that address several aspects of CDU and its operations.  Implementation of the Department's formal training guidance, requirements, and lesson plans is crucial to its mission.  Formalizing and implementing equipment standards will provide officers with proper functioning equipment.  Additionally, the Department should require that all types of weapon systems classified as less lethal are staged prior to large events as well as ensure that the Department train and certify additional CDU Grenadiers[1].

Ensuring that the Department conducts periodic safety inspections would prevent CDU from deploying or using expired munitions.  Also, the Department needs a formal process for management within CDU to ensure that when munitions do expire CDU exchanges them appropriately with the Property and Asset Management Division for proper disposal in a timely manner.  Further, USCP should store its riot shields in the proper temperature-stable climate to prevent compromise of the riot shield's life span.

USCP Directive 2055.001, *Specialty Pay Program*, effective August 1, 2019, states that "the Chief of Police is authorized to establish and determine positions within the USCP as specialty assignments or requiring certain proficiencies eligible for additional compensation." The Department has and continues to experience difficulty in recruiting and retaining officers in serving in the CDU Unit. Exploring options for incentivizing the CDU Program would go a long way toward increasing participation because of its hazardous nature.  As well, holding management accountable for incomplete CDU audits would enforce controls.

---

[1] A Grenadier is an officer trained and qualified in the use of Department issued less-lethal weapons.  Grenadiers deploy less-lethal weapons in support of CDU operations.

Based on our follow-up analysis, a condition identified in two previous reports, the Department's failure to update and document evaluations of its intelligence priorities reemerged. We also identified intelligence related deficiencies with the Department's organizational structure, training, professional standards, internal controls, and capability to effectively collect, process, and disseminate intelligence information.

To increase the efficiency of its intelligence resources, the Department should consider reorganizing its intelligence functions into a single intelligence bureau.  A formal Intelligence Training Program is necessary; otherwise, the Department cannot ensure the proper training of its intelligence employees or ensure that they are up to date on policies and procedures related to IICD personnel duties.  Furthermore, implementing additional formal guidance that applies to USCP's collection, processing, and reporting of information would improve its ability to effectively disseminate intelligence throughout the Department.  Lastly, the Department should address gaps in meeting the intelligence needs of its operational stakeholders; the lack of training, certification, or professional standards for its intelligence analysts; and determine the necessary staffing, security clearances, and technology IICD needs to accomplish its mission.

In conclusion, the Department is comprised of extraordinary men and women who are dedicated to protecting our democracy, putting their own lives in harm's way in order for Congress to exercise their Constitutional duties in a safe and open manner.  It is our duty to honor those officers who have given their lives but also ensuring the safety of all those working and visiting the Capitol Complex by making hard changes within the Department.

Thank you for the opportunity to appear before you today.  I would be very happy to answer any questions the Committee may have at this time.

# Exhibit 4




# UNITED STATES CAPITOL POLICE OFFICE OF INSPECTOR GENERAL

## Review of the Events Surrounding the January 6, 2021, Takeover of the U.S. Capitol

## Flash Report: Operational Planning and Intelligence

### Investigative Number 2021-I-0003-A

### February 2021

### *Report Restriction Language*

**Distribution of this Document is Restricted**

This report may contain sensitive law enforcement information and/or is part of the deliberative process privilege. This is the property of the Office of Inspector General and is intended solely for the official use of the United States Capitol Police, the Capitol Police Board, or any agency or organization receiving the report directly from the Office of Inspector General. No secondary distribution may be made, in whole or in part, outside the United States Capitol Police or the Capitol Police Board, by them or by other agencies or organizations, without prior authorization by the Inspector General or the Capitol Police Board.

## EXECUTIVE SUMMARY

On January 6, 2021, a physical breach of U.S. Capitol Building security occurred during a Joint Session of Congress to certify the Electoral College vote. See Appendix A for the United States Capitol Police's (USCP or Department) official timeline of events leading up to and during the physical security breach.

In accordance with our statutory authority Public Law (P.L.) 109-55, the USCP Office of Inspector General (OIG) began a review of the events surrounding the takeover of the U.S. Capitol on January 6, 2021. Our objectives for this review were to determine if the Department (1) established adequate measures for ensuring the safety and security of the Capitol Complex as well as Members of Congress, (2) established adequate internal controls and processes for ensuring compliance with Department policies, and (3) complied with applicable policies and procedures as well as applicable laws and regulations. The scope included controls, processes, and operations surrounding the security measures prior to the planned demonstrations and response during the takeover of the Capitol building.

Based on this ongoing work, this flash report is designed to communicate any deficiencies with the Department's operational planning and intelligence for planned demonstrations on January 6, 2021. The deficiencies included the following (a) lack of a comprehensive operational plan or adequate guidance for operational planning, (b) failure to disseminate relevant information obtained from outside sources, (c) lack of consensus on the interpretation of threat analyses, (d) dissemination of conflicting intelligence, and (e) lack of security clearances.

In order to improve its operational planning capabilities, USCP should implement detailed guidance for operational planning. The guidance should include policies and procedures that designate the entity or entities responsible for overseeing the operational planning and execution process, require documentation of supervisory review and approval, and standardize planning document formats. Guidance should also require that individual units develop plans and coordinate those plans with other units for a comprehensive, Department-wide effort. Additionally, the guidance should communicate when specific operational planning documents are required. For, example the Department could use a multi-tiered system based on the anticipated size and scope of an event as criteria for determining the required level of operational planning documentation it needs to prepare.

Implementing formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders would improve USCP ability to effectively disseminate intelligence throughout the Department. Providing additional training to personnel on how to better understand intelligence assessments and an increased role for

1

Department entities that have intelligence analysis and dissemination responsibilities in operational planning would also improve USCP ability to achieve a consensus on threat analyses. Furthermore, the Department should require supervisory review and approval for intelligence products to ensure the products are supported by relevant intelligence information and are internally consistent.  Lastly, receiving classified briefings on emerging threats and tactics would better prepare the Department's sworn and operational civilian employees to identify and counter threats and tactics in the field.  See Appendix B for a complete list of recommendations.

This is the first in a series of flash reports OIG will produce as part of its ongoing review of the events surrounding the takeover of the U.S. Capitol on January 6, 2021.  Therefore, we may still perform additional, in-depth work related to those areas during our review.  We anticipate that our next flash report will focus on the Department's intelligence operations and Civil Disturbance Unit.

## BACKGROUND

On January 6, 2021, a physical breach of U.S. Capitol security occurred during a Joint Session of Congress to certify the Electoral College vote. See Appendix A for the United States Capitol Police's (USCP or Department) official timeline of events leading up to and during the physical security breach.

The Department's Protective Services Bureau (PSB) and Security Services Bureau are the two operational bureaus that report to the Assistant Chief of Police for Protective and Intelligence Operations. According to PoliceNet,[1] PSB's mission is to "provide safety and security to the Capitol, Members of Congress, Officers of Congress, and their immediate family."  PSB has a Dignitary Protection Division, Investigations Division, and Intelligence and Interagency Coordination Division (IICD).

The PSB Investigations Division has three sections: the Criminal Investigations Section, the Threat Assessment Section, and the Intelligence Operations Section (IOS).

PoliceNet states that IOS:

- Provides overt and covert patrol of the Congressional Community to identify and disrupt individuals or groups intent on engaging in illegal activity directed at the Congressional Community and its legislative process.

- Provides an investigative response to identified or reported suspicious activity to determine any nexus to terrorism or other criminal activity.

- Conducts protective intelligence operations to support Department operations related to Member Protection, Threat Assessment, and Intelligence Collection.

---

[1] PoliceNet is the Department's intranet.

2

LAW ENFORCEMENT SENSITIVE

# *Listing of Recommendations*

**Recommendation 1**:  We recommend the United States Capitol Police establish policies and procedures requiring documentation for supervisory review and approval, standardized planning document formats, and communication to personnel of criteria for determining the level of operational planning documentation necessary for each anticipated event.

**Recommendation 2**:  We recommend the United States Capitol Police establish policies and procedures designating the specific entity or entities responsible for overseeing the operational planning and execution process for each anticipated event.

**Recommendation 3**:  We recommend the United States Capitol Police establish policies and procedures requiring that individual units develop operational plans and coordinate those plans with other units for a comprehensive, Department-wide effort.

**Recommendation 4**:  We recommend the United States Capitol Police implement formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders.

**Recommendation 5**:  We recommend the United States Capitol Police implement detailed policies and procedures requiring any threat analysis included in operational planning is coordinated with Department entities having intelligence analysis and dissemination responsibilities.

**Recommendation 6**:  We recommend the United States Capitol Police provide training to its personnel on how better to understand and interpret intelligence assessments.

**Recommendation 7**:  We recommend the United States Capitol Police revise Standard Operating Procedure PS-602-08, *Analytic Standards*, dated February 1, 2018, to require supervisory review and approval for intelligence products to ensure its products are supported by relevant intelligence information and internally consistent.

**Recommendation 8**:  We recommend the United States Capitol Police require its sworn and operational civilian employees to obtain a Top Secret clearance and require that administrative civilian employees obtain a minimum of a Secret clearance.

# Exhibit 5

# U.S. CAPITOL POLICE BUDGET CONCERNS

# HEARING

BEFORE THE

## SUBCOMMITTEE ON CAPITOL SECURITY

OF THE

## COMMITTEE ON HOUSE ADMINISTRATION

## HOUSE OF REPRESENTATIVES

### ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

———

HELD IN WASHINGTON, DC, JULY 29, 2010

———

Printed for the use of the Committee on House Administration



Available on the Internet:
*http://www.gpoaccess.gov/congress/house/administration/index.html*

———

U.S. GOVERNMENT PRINTING OFFICE
58–000                    WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON HOUSE ADMINISTRATION

ROBERT A. BRADY, Pennsylvania, *Chairman*

ZOE LOFGREN, California,
   *Vice-Chairwoman*
MICHAEL E. CAPUANO, Massachusetts
CHARLES A. GONZALEZ, Texas
SUSAN A. DAVIS, California
ARTUR DAVIS, Alabama

DANIEL E. LUNGREN, California,
   *Ranking Minority Member*
KEVIN McCARTHY, California
GREGG HARPER, Mississippi

### PROFESSIONAL STAFF

JAMIE FLEET, *Staff Director*
VICTOR ARNOLD-BIK, *Minority Staff Director*

———

## SUBCOMMITTEE ON CAPITOL SECURITY

MICHAEL E. CAPUANO, Massachusetts, Chairman

ROBERT A. BRADY, Pennsylvania

DANIEL E. LUNGREN, California

# HEARING ON U.S. CAPITOL POLICE BUDGET CONCERNS

————

### THURSDAY, JULY 29, 2010

House of Representatives,
Subcommittee on Capitol Security,
Committee on House Administration,
*Washington, DC.*

The subcommittee met, pursuant to call, at 11:00 a.m., in room 1310, Longworth House Office Building, Hon. Michael E. Capuano (chairman of the subcommittee) presiding.

Present: Representatives Capuano and Lungren.

Staff Present: Jamie Fleet, Staff Director; Matt Pinkus, Professional Staff/Parliamentarian; Kyle Anderson, Press Director; Joe Wallace, Legislative Clerk; Darrell O'Connor, Professional Staff; Ryan Caimi, Intern; and Katie Ryan, Minority Professional Staff.

Mr. CAPUANO. The hearing will come to order. The purpose of the hearing is to exercise the subcommittee's oversight function. In considering the Inspector General's audit of the Capitol Police budget, formulation process, significant problems were discovered earlier this year. The subcommittee would like some explanation as to what went wrong and how it is being corrected.

Today we have I believe only two people testifying, Chief Morse and Mr. Hoecker from the Inspector General. And with that, I am going to forgo any introductory comments and yield to the ranking member.

[The information follows:]

(1)

2



# UNITED STATES CAPITOL POLICE
# OFFICE OF INSPECTOR GENERAL

## Audit of USCP Budget Formulation Process

### Report Number OIG-2010-03
### June 2010

*Important Notice – Distribution of This Document Is Restricted*

This report is intended solely for the official use of the United States Capitol Police or the Capitol Police Board, or any agency or organization receiving a copy directly from the Office of Inspector General.  No secondary distribution may be made, in whole or in part, outside the United States Capitol Police or the Capitol Police Board, by them or by other agencies or organizations, without prior authorization by the Inspector General or the Capitol Police Board.

3

# UNITED STATES CAPITOL POLICE
*WASHINGTON, DC*



*INSPECTOR GENERAL*

## PREFACE

The Office of Inspector General (OIG) prepared this report pursuant to the Inspector General Act of 1978, as amended.  It is one of a series of audit, reviews, and investigative and special reports prepared furtherance of our responsibility to identify and prevent fraud, waste, abuse, and mismanagement within the programs and operations of the United States Capitol Police.

This report is the result of an assessment of the strengths and weaknesses of the office or function under review.  It is based on interviews with employees and officials of relevant agencies and institutions, direct observation, and a review of applicable documents.

The recommendations herein have been developed on the basis of the best knowledge available to the OIG, and have been discussed in draft with those responsible for implementation.  It is my hope that these recommendations will result in more effective, efficient, and/or economical operations.

I express my appreciation to all of those who contributed to the preparation of this report.

*Carl W. Hoecker*
**Carl W. Hoecker**
**Inspector General**

4

## *TABLE OF CONTENTS*

|  | **Page** |
|---|---|
| **Abbreviations** | iii |
| **Executive Summary** | 1 |
| **Background** | 3 |
| **Objectives, Scope and Methodology** | 5 |
| **Results** | 8 |
|     **Inadequate Controls** | 9 |
|     **Past Processes and Practices not Followed** | 13 |
|     **Overarching Cause "Tone at the Top"** | 18 |
|     **Inaccurate Salaries and Benefits Budget Submissions** | 23 |
|     **Potential Shortfall in the Radio Modernization Project** | 39 |
| **Other Matters** | 40 |
| **Appendices** | |
|     **Appendix A - Summary of Recommendations** | 42 |
|     **Appendix B - Department Comments (COP 100579)** | 44 |
|     **Appendix C - Department Comments (COP 100576)** | 49 |
|     **Appendix D - OIG Evaluation of Department Response to Draft Report** | 56 |
| **Exhibit 1- USCP Budget Formulation Process** | 72 |

76

**_Comment Provided By The Chief_** - Page 39, third full paragraph - The new Executive Sponsor was appointed in March 2010, rather than January 2010.

**OIG Response:** As previously stated, through our quality control process, OIG found and corrected the appointment date of the new Executive Sponsor.

**_Comment Provided By The ET_** - Page 40, first full paragraph under "OTHER MATTERS" - As stated previously in the Department's recommendations response memorandum, the Department does not make reference to investigatory activities in document that are intended for publication in order to protect the due process rights of those involved.

**OIG Response:** As previously stated, as required by _Government Auditing Standards_, when auditors conclude, based on sufficient, appropriate evidence, that fraud, illegal acts, or significant abuse either has occurred or is likely to have occurred, they should report the matter as finding. OIG also must consider whether the omission could distort the audit results or conceal improper and illegal practices. Our enabling legislation requires OIG to report to the Chief, Capitol Police Board, and Congress, as demonstrated by the Semiannual Report to Congress. In reporting this audit, OIG did not disclose the identities of those suspected of misconduct. Thus, we have accurately reported our activity to our stakeholders and without compromising the investigation. Additionally, in accordance with OIG's reporting protocols, the _Executive Summary_; _Objectives, Scope, and Methodology_; and _Body_ of the report must all stand alone and can be read as separate documents. Thus, this issue is reported in the _Executive Summary_ as well as other areas of the report.

# Exhibit 6

U.S. ELECTION ASSISTANCE COMMISSION
OFFICE OF INSPECTOR GENERAL



SYSTEM REVIEW REPORT FOR THE AUDIT PEER REVIEW OF THE

# UNITED STATES CAPITOL POLICE

# OFFICE OF INSPECTOR GENERAL

FOR THE YEAR ENDED SEPTEMBER 30, 2016

NO. E-PR-USCP-01-17
MARCH 2017



**U.S. ELECTION ASSISTANCE COMMISSION**
1335 EAST-WEST HIGHWAY, SUITE 4300
SILVER SPRING, MD 20910
*OFFICE OF THE INSPECTOR GENERAL*

**System Review Report**

March 16, 2017

Fay F. Ropella, CPA, CFE
Inspector General
United States Capitol Police

We have reviewed the system of quality control for the audit organization of the United States Capitol Police, Office of Inspector General (USCP OIG) in effect for the year ended September 30, 2016. A system of quality control encompasses USCP OIG's organizational structure and the policies adopted and procedures established to provide it with reasonable assurance of conforming with *Government Auditing Standards*. The elements of quality control are described in *Government Auditing Standards*. USCP OIG is responsible for establishing and maintaining a system of quality control that is designed to provide USCP OIG with reasonable assurance that the organization and its personnel comply with professional standards and applicable legal and regulatory requirements in all material respects. Our responsibility is to express an opinion on the design of the system of quality control and USCP OIG's compliance therewith based on our review.

Our review was conducted in accordance with *Government Auditing Standards* and the Council of the Inspectors General on Integrity and Efficiency (CIGIE) *Guide for Conducting Peer Reviews of the Audit Organizations of Federal Offices of Inspector General*. During our review, we interviewed USCP OIG personnel and obtained an understanding of the nature of the USCP OIG audit organization, and the design of USCP OIG's system of quality control sufficient to assess the risks implicit in its audit function. Based on our assessments, we selected audits and administrative files to test for conformity with professional standards and compliance with USCP OIG's system of quality control. The audits selected represented a reasonable cross-section of USCP OIG audit organization, with emphasis on higher-risk audits. Prior to concluding the peer review, we reassessed the adequacy of the scope of the peer review procedures and met with USCP OIG management to discuss the results of our review. We believe that the procedures we performed provide a reasonable basis for our opinion.

In performing our review, we obtained an understanding of the system of quality control for the USCP OIG audit organization. In addition, we tested compliance with USCP OIG's quality control policies and procedures to the extent we considered appropriate. These tests covered the application of USCP OIG's policies and procedures on selected audits. Our review was based on

selected tests; therefore, it would not necessarily detect all weaknesses in the system of quality control or all instances of noncompliance with it.

There are inherent limitations in the effectiveness of any system of quality control, and, therefore, noncompliance with the system of quality control may occur and not be detected. Projection of any evaluation of a system of quality control to future periods is subject to the risk that the system of quality control may become inadequate because of changes in conditions, or because the degree of compliance with the policies or procedures may deteriorate.

Enclosure 1 to this report identifies the USCP OIG audits that we reviewed.

In our opinion, the system of quality control for the audit organization of USCP OIG in effect for the year ended September 30, 2016, has been suitably designed and complied with to provide USCP OIG with reasonable assurance of performing and reporting in conformity with applicable professional standards in all material respects. Audit organizations can receive a rating of *pass*, *pass with deficiencies*, or *fail*. USCP OIG has received an External Peer Review rating of *pass*.

In addition to reviewing its system of quality control to ensure adherence with *Government Auditing Standards*, we applied certain limited procedures in accordance with guidance established by the CIGIE related to USCP OIG's monitoring of audits performed by Independent Public Accountants (IPAs) under contract where the IPA served as the auditor. It should be noted that monitoring of audits performed by IPAs is not an audit and, therefore, is not subject to the requirements of *Government Auditing Standards*. The purpose of our limited procedures was to determine whether USCP OIG had controls to ensure IPAs performed contracted work in accordance with professional standards. However, our objective was not to express an opinion and accordingly, we do not express an opinion, on USCP OIG's monitoring of work performed by IPAs.

Patricia L. Layfield, CPA, CIA, CISA
Inspector General


Enclosures

Enclosure 1

## Scope and Methodology

We tested compliance with USCP OIG audit organization's system of quality control to the extent we considered appropriate. These tests included a review of three of four audit reports issued during the period October 1, 2015, through September 30, 2016. We also reviewed the internal quality control reviews performed by USCP OIG.

In addition, we reviewed USCP OIG's monitoring of the one audit performed by IPAs where the IPA served as the auditor during the period October 1, 2015, through September 30, 2016. During the period, USCP OIG contracted for the audit of its agency's fiscal year 2015 financial statements.

We visited USCP OIG's only office, located in Washington, DC.

| Reviewed Audits Performed by USCP OIG | | |
|---|---|---|
| Report No. | Report Date | Report Title |
| OIG-2016-07 | May 2016 | Performance Audit of the United States Capitol Police Training Services Bureau |
| OIG-2016-10 | August 2016 | Performance Audit of the United States Capitol Police Mobile Device Program |

| Reviewed Monitoring Files of USCP OIG for Contracted Audits | | |
|---|---|---|
| Report No. | Report Date | Report Title |
| OIG-2016-01 | December 1, 2015 | Audit of the United States Capital Police's Fiscal Year 2015 Financial Statements |

Enclosure 2

# UNITED STATES CAPITOL POLICE

WASHINGTON, DC 20510

March 7, 2017

*INSPECTOR GENERAL*

Ms. Patricia L. Layfield, CPA, CIA, CISA
Inspector General
U.S. Election Assistance Commission
1335 East-West Highway, Suite 4300
Silver Spring, MD 20910

Dear Inspector General Layfield:

We appreciate the opportunity to respond to the U.S. Election Assistance Commission, Office of Inspector General's draft System Review Report on the U.S. Capitol Police's Office of Inspector General (USCP OIG) Audit Organization. We are pleased that your review has concluded that the audit organization of USCP OIG has earned a pass rating. We have no further comments on the System Review Report.

USCP OIG is committed to maintaining an effective system of quality controls, and we appreciate the thorough and professional manner in which your office conducted this review. If you have any questions, please contact me at (202) 593-4800, or contact Mr. Thomas Schweinefuss, Assistant Inspector General for Audits, at (202) 593-3867.

Sincerely,

*Fay F. Ropella*

Fay F. Ropella, CPA, CFE
Inspector General