UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JASON LEOPOLD, *et al.*, | ) | |
| | ) | |
| PLAINTIFFS | ) | Civil Action No. 1:21-cv-465 (BAH) |
| vs. | ) | |
| | ) | |
| J. THOMAS MANGER, *et al.*, | ) | |
| | ) | |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |
| | ) | |

## REPLY IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

**I.      The court has jurisdiction to hear this case.**

**A.  Binding D.C. Circuit precedent requires a finding of jurisdiction in this case.**

The government spills much ink on the issue of jurisdiction in its attempt to avoid the clear holding of the D.C. Circuit in *WLF II* that the *Larson-Dugan* exception to sovereign immunity doctrine applies to a common law right of action for access to public records. *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897 (D.C. Cir. 1996) (*WLF II*). The government appears to believe that the jurisdictional issue in *WLF II* was wrongly decided. (Opp. CMSJ at 4) ("[T]he court's analysis elided the fact that the *Larson-Dugan* exception only applies when an official is alleged to have acted beyond statutory authority or unconstitutionally.") However, while the government may press that argument to the D.C. Circuit *en banc* or the Supreme Court, this Court lacks the authority to overrule binding circuit precedent. Indeed, this Court has previously held as much. *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 313 (D.D.C. 2020) (*Judicial Watch I*) ("[D]efendants' argument that the *Larson-Dugan* exception is inapplicable because the powers of House Defendants are simply not limited by statute and, thus, no statutory

limitations on the issuance of subpoenas by a House committee during an investigation exist, is

forestalled by binding D.C. Circuit precedent") (internal quotation marks and citations omitted).

Even if the government is correct that its specific argument about the applicability of the

*Larson-Dugan* doctrine was not "presented to, or considered by, the D.C. Circuit" (CMSJ at 5) –

a proposition the government fails to support – this Court is still not free to reach a decision that

contradicts circuit precedent on the same issue decided by the appellate court. *Mendez v.*

*Poitevent*, 823 F.3d 326, 335 (5th Cir. 2016) ("[P]laintiffs counter that we are not bound under

the rule of orderliness by *Villafranca* or *Davila* because the court purportedly did not consider, in

either case, plaintiffs' specific arguments. But plaintiffs are incorrect. *De La Paz* does not stand

for the proposition that the rule of orderliness may be skirted where a party dreams up new

arguments that were not presented to a prior panel"); *Tippitt v. Reliance Standard Life Ins. Co.*,

457 F.3d 1227, 1234 (11th Cir. 2006) ("Tippitt's argument that we should not be bound by

*Levinson* because this point was not really argued in that case runs afoul of our decisions that a

prior panel precedent cannot be circumvented or ignored on the basis of arguments not made to

or considered by the prior panel"); *Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001)

("Permitting an 'overlooked reason' exception would undermine the values of stability and

predictability in the law that the prior panel precedent rule promotes"); *United States v. Russell*,

461 F.2d 605, 608 (10th Cir. 1972) ("[I]t is argued that the Supreme Court in *Leighton* was not

fully apprised by counsel in that case as to the legislative history of § 6901 and that had that

court been more fully informed it would have ruled differently. Such argument should be made

to the Supreme Court, and not us. We are not at liberty to go behind the *Leighton* rule"); *Rambus*

*Inc. v. Hynix Semiconductor, Inc.*, 569 F. Supp. 2d 946, 972 (N.D. Cal. 2008) ("*Stare decisis*

would be largely meaningless if a lower court could change an appellate court's interpretation of

the law based only on a new argument.")

Illustrative of this principle is the D.C. Circuit's decision in *We the People Found., Inc. v. United States*, 485 F.3d 140, 144 (D.C. Cir. 2007). There, the plaintiffs argued that a Supreme Court case, *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271 (1984), "overlooked important historical information regarding the right to petition." *Id.* The plaintiffs were correct that the Supreme Court's opinion did "not refer to the historical evidence and . . . the historical argument was not presented to the Supreme Court," *We the People Found.*, 485 F.3d at 145 (Rogers, J., concurring). However, both the majority and concurring opinions found *Knight* to be binding.

The only attempt the government makes to distinguish *WLF II* is to note that *WLF II* involved "an entity in the *Judicial* Branch" and therefore should not be applied to a case involving "entities in the *Legislative* Branch." (Opp. CMSJ at 5) (emphasis in original). However, this difference is irrelevant in terms of sovereign immunity. Neither officers of the legislative branch nor officers of the judicial branch are sovereign. If sovereign immunity applies in this case, it would be because "the relief sought in [this] suit nominally addressed to the officer is relief against the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 687 (1949).

**B.  Even if this Court were free to reach a decision contrary to *WLF II*, it should not do so.**

The Supreme Court held in *Larson* that sovereign immunity does not bar a suit against a federal officer where the "officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. . . . [R]elief can be granted, without impleading the sovereign . . . because of the officer's lack of delegated power." *Larson*, 337 U.S. at 689. The government argues that in this case the *Larson-Dugan* exception does not apply because Plaintiffs "have nowhere alleged official action 'beyond statutory

authority.'" (Opp. CMSJ at 3.) But there is no such requirement. As the D.C. Circuit has explained, "Although the district court suggested and the defendants argue that the *Larson-Dugan* exception is limited to cases alleging that defendants have acted beyond *statutory* authority, there is no basis for such a limitation[.]" *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (emphasis in original, internal citation omitted).

The government further asserts that "the Supreme Court explained in *Larson* itself that the exception does not apply to claims advanced under the common law," (Opp. CMSJ at 3) but this argument "confuses the doctrine of sovereign immunity with the requirement that a plaintiff state a cause of action." *Larson*, 337 U.S. at 692-93. While the Supreme Court in *Larson* rejected the argument that an "agent's action, because tortious, is, *for that reason alone*, *ultra vires* his authority," *id.* at 694 (emphasis added), Plaintiffs' claims are not tort claims. Instead, Plaintiffs' non-statutory causes of action, while arising from federal common law, are challenges to the legality of the defendants' refusal to disclose records. *See Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996). Defendants never explain why it matters whether "the business which the sovereign has empowered [them] to do," *Larson*, 337 U.S. at 689, is rooted in a statute or the common law.

## II.    The Capitol Police Directives are public records.

The D.C. Circuit defined a "public record" as "a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *WLF II*, 89 F.3d at 905. As explained in Plaintiffs' opening brief, the Directives have "legal significance" because they are binding on USCP employees, are subject to judicial review, and memorialize an order of the Chief of Police. (CMSJ 7-8.)

The government responds that "the preliminary nature of a document disqualifies it as a 'public record,'" and argues that "the directives are preliminary or advisory materials—and therefore not public records—because they do not memorialize any official action in their own right, but rather provide instruction and guidance to USCP employees on how to take official action or to reach an official decision." (Opp. CMSJ at 9-10.) The government is wrong on both counts.

### A.  Documents that have legal significance are not preliminary.

The government is incorrect as a matter of law in claiming that a document having legal significance can be "disqualifie[d]" from being a public record because it is of a preliminary nature. The D.C. Circuit's concise definition of a "public record" in *WLF II* does not contain an exception to the category of "legal significance" for preliminary material. Instead, when the D.C. Circuit's definition of a "public record" is applied, the *result* will be that preliminary material will not be deemed to have legal significance. *WLF II*, 89 F.3d at 905 ("This definition . . . is . . . narrow enough to avoid the necessity for judicial application of the second-step balancing test to documents that are preliminary[.]") There is no such thing as material that both has legal significance and is preliminary; if it is preliminary, it has no legal significance. *Judicial Watch I*, 474 F. Supp. 3d at 316 ("Here, the requested subpoenas were . . . so preliminary to any final recommendation that this action lacks the legal significance to constitute a 'public record' to which the right of public access attaches.")

Since materials that are "preliminary, advisory, or, for one reason or another, do not eventuate in any official action or decision being taken" have no legal significance, *id.,* this Court in *Judicial Watch I* considered whether the requested subpoenas fell into one of these three categories. This Court observed that the subpoenas "certainly reflect an official action of the

5

Committee" and did not suggest that the subpoenas were advisory. However, since this Court considered the subpoenas to be preliminary, it concluded that they therefore have no legal significance. *Id.*

This surprising result – that subpoenas have no legal significance – occurred because of the sequence in which this Court considered the issues at play. This Court first considered whether the subpoenas were preliminary, and then drew a conclusion as to their legal significance based on the result of that inquiry. On appeal, the majority opinion of the D.C. Circuit did not consider the question of whether the subpoenas were public records, but Judge Henderson's concurrence analyzed the question in the reverse of the order in which this Court considered it. Judge Henderson concluded that because subpoenas have legal significance, there is nothing preliminary about them. *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 995 (D.C. Cir. 2021) (*Judicial Watch II*) (Henderson, J. concurring) ("But there is nothing 'preliminary' about a subpoena issued by the Congress—it is an 'official action' that constitutes a 'matter of legal significance, broadly conceived.'") A subpoena has legal significance, according to Judge Henderson, because of the potential consequences of failing to comply with it. *Id.* ("The potential consequences for failure to comply with a Congressional subpoena lay bare the difference, in the context of the 'public record' definition, between a subpoena and preliminary draft materials like those at issue in *WLF II* and *Pentagen Technologies*.")

Judge Henderson's opinion fits comfortably with the D.C. Circuit's prior decisions. Considering the question of legal significance first is sensible because it ensures that a court will not reach the strange result of concluding that material which represents binding, enforceable orders is not legally significant. At the same time, her order of operations would not sweep too broadly because it is difficult to imagine any truly preliminary material that is binding or

enforceable. If it is unclear whether material is legally significant, of course, a court can then

turn to the question of whether the material is preliminary. As this Court correctly recognized,

the question of whether material is preliminary is a "guidepost[]" in determining whether a

document is a public record, *Judicial Watch I*, 474 F. Supp. 3d at 315, with the ultimate question

being whether the record is legally significant. There is another "guidepost[]" that a court must

consider in determining whether a material is a public record, which is "adequately protect[ing]

the public's interest in keeping a watchful eye on the workings of public agencies," *WLF II*, 89

F.3d at 905. The definition of a public record adopted by the D.C. Circuit in *WLF II* strikes a

balance between these two interests. Judge Henderson's view is also consistent with *WLF II*

court's direction that the concept of legal significance is to be "broadly conceived." *Id.* Including

binding, enforceable orders within the definition of "legal significance" accords with this

instruction.

Judge Henderson's position is also consistent with other D.C. Circuit case law. In holding

that a brief and appendix submitted by a party have legal significance for purposes of the

common law right of access, the D.C. Circuit did not go on to consider whether the material was

preliminary. *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 668 (D.C. Cir.

2017). Had the D.C. Circuit instead applied the government's test, it would have reached the

opposite conclusion – a brief and appendix are clearly preliminary to a final decision and

therefore would not be public records even though they have legal significance as part of the

court's record.  The government argues that the D.C. Circuit's conclusion in *MetLife* is

distinguishable because it is "unique to the judicial records inquiry[.]" (Opp. CMSJ at 11.)

However, the government does not explain why this distinction matters. To the contrary, in

adopting a definition of "public record," the D.C. Circuit explained that its "definition is also

consistent with the federal cases holding that documents and exhibits filed with or introduced into evidence in a federal court are public records." *WLF II*, 89 F.3d at 906. Thus, the D.C. Circuit clearly intended the same definition of "public records" to apply in the same manner outside the context of judicial records.

Finally, the government's extreme position, which would leave virtually no material subject to the public right of access, has been rejected by the D.C. Circuit. The government's position is that all material is preliminary material except that which records "the final action or recommendation that the entity is empowered to provide." (Opp. CMSJ at 12.) Under this view, the only document that would not be preliminary in *WLF* is the final report of the Advisory Group, since its sole mission was to create the report. This was essentially the view of the district court in *WLF I. Wash. Legal Found. v. United States Sentencing Comm'n*, 17 F.3d 1446, 1451 (D.C. Cir. 1994) ("The district court rejected the claim in its entirety, noting that the common law right extends only to 'public records,' not to every document contained in government files. The court held that the documents sought by WLF were not public records, but 'pre-decisional materials upon which a final recommendation to the Commission may develop.'") The D.C. Circuit reversed and remanded, holding that "[b]efore finding that WLF's entire request was beyond the scope of the common law right, the court should have analyzed each category of document requested and, if a category is reasonably likely to contain publicly accessible documents, each document within such category, to determine whether any of those documents might in fact be subject to public access. An appropriate way to undertake this analysis would be to order a *Vaughn* index." *Id.* at 1452. The categories of records that the district court was required to familiarize itself with were "internal notes and memoranda, preliminary drafts of proposed guidelines, internal discussion memoranda, copyrighted scholarly research, and public

comments on publicly released draft guidelines." *Id.* at 1451. Under the government's position in this case, no such review would have been necessary because only the final advisory report is "the final action or recommendation that the entity is empowered to provide." (Opp. CMSJ at 12.)

### B.  The Capitol Police Directives memorialize an official action or statement and have legal significance.

In their opening brief, Plaintiffs argue that the Directives have "legal significance" because they are binding on USCP employees. (CMSJ at 7.) The government admits that "USCP written directives are generally binding on employees," (Def. Resp. Pl. SOMF ¶ 1), but disputes that "the generally binding nature of USCP directives gives them legal significance and thereby renders them a 'public record' *per se*." (Opp. CMSJ at 10.) In support of its position, the government relies solely on this Court's decision in *Judicial Watch I*, arguing that if Plaintiffs' view were adopted, "the congressional subpoenas in Judicial Watch would easily have qualified—there was no dispute that the subpoenas issued by the Committee bound the recipient to respond." (Opp. CMSJ at 10.) For the reasons set forth in the previous section, Plaintiffs agree with Judge Henderson that the congressional subpoenas in *Judicial Watch* easily qualify because their binding nature gives them legal significance. Nevertheless, this Court's decision in *Judicial Watch I* is distinguishable from the present case.

First, unlike a subpoena, the Directives are binding on the government entity itself. This is significant because it means that classifying the material as a public record would go much further in advancing the "public's interest in keeping a watchful eye on the workings of public agencies," *WLF II*, 89 F.3d at 905, one of the guideposts for determining what constitutes a

public record. The Directives dictate the actions an agency is expected to take, as opposed to the actions a third party is expected to take.

Second, the subpoenas in *Judicial Watch* were deemed preliminary because they were investigative in nature, as were the reports in *Pentagen Techs. Int'l v. Comm. on Appropriations of the United States H.R.*, 20 F. Supp. 2d 41 (D.D.C. 1998), *aff'd*, 194 F.3d 174 (D.C. Cir. 1999). In contrast, the Directives are not investigatory in nature, and therefore the reasoning of those two cases in inapposite here.

Finally, *Judicial Watch I* considered whether the documents involved legally significant *actions* and said nothing about when documents qualify as legally significant *statements*. The government does not directly address this point, but in holding that a public record includes a "statement . . . of legal significance, broadly conceived," *WLF II*, 89 F.3d at 905, the D.C. Circuit surely meant to include a final, binding statement of agency policy. A final statement of agency policy is not "preliminary." *Trea Senior Citizens League v. United States Dep't of State*, 994 F. Supp. 2d 23 (D.D.C. 2013).

The government counters, "It may be that an agency's 'expression of final agency policy' is not predecisional . . . but that does not mean such a document is not 'preliminary' in the sense intended by the D.C. Circuit[.]" (Opp. CMSJ at 11.) The government attempts to distinguish *Trea* on the grounds that "internal law enforcement directives containing guidance for specific situations are 'preliminary' to actual actions taken in those situations for purposes of the common law right of access." (Opp. CMSJ at 11.) The government's argument, however, misses Plaintiffs' point that the Directives are statements which are final and not preliminary. Further, to the extent that the government is attempting to distinguish between "predecisional" material and

"preliminary" material, there is no meaningful distinction. The D.C. Circuit used the terms interchangeably. *WLF II*, 89 F.3d at 906.

The government also objects to Plaintiffs' view on the ground that it "would render virtually every written order of the Capitol Police Chief subject to public disclosure, merely because of his authority within the agency." (Opp. CMSJ at 12.) At issue in this case, however, is not just any "written order of the Capitol Police Chief," but written orders adopting final agency policies. Thus, the Directives are readily distinguishable from other orders that a Capitol Police Chief may make in their day-to-day operations.

At any rate, documents are not "subject to public disclosure" simply because they are public records. The common law right of access is qualified and may be defeated by a showing of the need for secrecy. Thus, whereas Plaintiffs' requests for the Directives does not seek "absolute transparency in a government law enforcement agency" (Opp. CMSJ at 12) because there might exist a compelling for nondisclcosure, the government's extraordinary position is that there should be absolute secrecy in a government agency.

### III. Defendants are not vested with unreviewable authority under 2 U.S.C. § 1979 to withholding information without an adequate explanation.

#### A. Judicial review is available for decisions as to whether information qualifies as "security information" under 2 U.S.C. § 1979.

The D.C. Circuit has recognized the availability of "non-statutory judicial review" even after passage of the APA. *Chamber of Commerce*, 74 F.3d at 1328. The government does not dispute that judicial review is available as such but seeks to effectively preclude judicial review by arguing that the decisions of the Capitol Police Board are irrebuttable: "[U]nless the Capitol Police Board, after statutorily prescribed consultations, determines that release of the information

will not compromise security and safety. . . . there is . . . no basis for requiring the USCP to disclose these 65 directives." (Opp. CMSJ at 7.) Further, the government has attempted to make judicial review impossible as a practical matter by resting its withholding decision solely on a conclusory statement that a Document Review Team deemed the directives to fall within the scope of 2 U.S.C. § 1979(a)(1). (Opp. CMSJ at 8) ("Further, it is inaccurate that the record is 'inadequate' (Pls.' Mem. 11) to determine whether the directives fall within the statutory scope of 'security information.' The USCP has averred that a dedicated Document Review Team determined 65 of the 101 directives at issue to meet that exceedingly broad statutory definition.")

Since the government does not offer a persuasive reason to believe that Congress intended to cut off judicial review to persons aggrieved by a decision under 2 U.S.C. § 1979(b), Plaintiffs are entitled to judicial review notwithstanding the government's protests. Further, for such judicial review to be meaningful, the government must provide the basis for its conclusions, not just assert that the documents can be withheld because of the *ipse dixit* of the Document Review Team. As the D.C. Circuit has explained, to "permit meaningful judicial review," a declaration must "provid[e] a sufficiently detailed explanation of the basis for the agency's conclusion." *Campbell v. United States DOJ*, 164 F.3d 20, 34 (D.C. Cir. 1998). Here, the government has failed to provide such a detailed explanation of its withholding decisions and therefore a ruling for the government on the current record would deny Plaintiffs meaningful judicial review.

The government further argues that under "§ 1979, Congress established a default non-disclosure rule *unless* the Capitol Police Board decides . . . to release specific 'security information' documents[.]" (Opp. CMSJ at 8) (emphasis in original). In the government's view, requiring the USCP to "provide a detailed justification for its security information (and, thus, non-disclosure) determinations" is impermissible because it would "flip . . . congressional intent

on its head, requiring the USCP to deviate from the default rule" of non-disclosure. (Opp CMSJ at 8.)

The government, however, fails to appreciate the significance of this case being brought under the common law right of access. When documents qualify as public records under the common law right of access, there is a presumption that the records should be disclosed. *Nixon v. Warner Commc'ns*, 435 U.S. 589, 602 (1978) (noting "the presumption . . . in favor of public access to judicial records" under the common law); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 677 (3rd Cir. 2019) (noting "the strong presumption of openness inherent in the common law right of access" and requiring the party opposing disclosure to "overcome the presumption"); *United States v. Carpenter*, 923 F.3d 1172, 1180 (9th Cir. 2019) ("Carpenter failed to provide a compelling reason to overcome this presumptive right of access"). This presumption of openness translates into the party claiming secrecy bearing the burden of proof. *Goldstein v. Forbes (In re Cendant Corp.)*, 260 F.3d 183, 194 (3rd Cir. 2001) ("The burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption"); *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) ("The party seeking to overcome the presumption of public access to the documents bears the burden of showing some significant interest that outweighs the presumption") (internal quotation marks omitted). Further, while many of the cases discussing the presumption of access involve judicial records, the public has just as great an interest in access to legislative branch records. *Judicial Watch II*, 998 F.3d at 997 ("As with a judicial record, there should be a 'strong presumption' in favor of disclosing a Congressional subpoena") (Henderson, J., concurring).

If this Court decides that the requested documents are "public records," it must proceed to the second step of the analysis, at which point any nondisclosure statute would be relevant. *MetLife*, 865 F.3d at 676. However, since the government is seeking to overcome the common law right of access, it bears the burden of showing that the statute applies to the information at issue in the first place. A *Vaughn* index must therefore be prepared unless the court can "say confidently, knowing no more than the general categories of documents . . . that none of these are public records that could survive the applicable balancing test." *WLF I*, 17 F.3d at 1452. Here, this Court knows only that the documents are Directives. Given the diverse subjects that may be covered by the numerous Directives, this Court cannot confidently say that none of the Directives will survive the balancing test without a *Vaughn* index establishing that the security information statute applies.

In response to Plaintiffs' argument that a *Vaughn* index is necessary here, the government responds that the existing factual record is adequate because "USCP has averred that a dedicated Document Review Team determined 65 of the 101 directives at issue to meet that exceedingly broad statutory definition." (Opp. CMSJ at 8.) Regardless of which party bears the ultimate burden of proof at trial, this affidavit does not properly support the government's motion for summary judgment because it does no more than recite the legal conclusion of the Document Review Team as to the applicability of a statute to a general set of documents. It contains no factual support for these conclusions. As a basic matter of civil procedure, "[a]n affidavit or declaration used to support . . . a motion [for summary judgment] must . . . set out facts that would be admissible in evidence," Rule 56(c)(4), and "legal conclusions are not evidence," *Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, 122 n.1 (D.D.C. 2003).

Further, if judicial review is to be meaningful, an agency must offer more than conclusory statements. *Thomas v. Comm'r of the SSA*, 625 F.3d 798, 800 (3rd Cir. 2010) ("conclusory statements are beyond meaningful judicial review") (internal quotation marks omitted); *Ellis v. Chao*, 336 F.3d 114, 122 (2nd Cir. 2003) ("conclusory statements . . . prevent the courts from undertaking meaningful judicial review[.]") Certainly, where an agency affidavit asserts no more than that it has determined a set of documents falls within the scope of a statute, the label "conclusory" is apt. *Founding Church of Scientology, Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 831 (D.C. Cir. 1979) ("In our view, the Boardman affidavit was far too conclusory to support the summary judgment awarded NSA. . . . Barren assertions that an exempting statute has been met cannot suffice to establish that fact[.]")

The government also fails to recognize the importance of a *Vaughn* index to the adversarial process. It faults Plaintiffs for "offer[ing] nothing but unsupported speculation that some of the 65 directives reviewed by the Document Review Team might not contain 'security information,'" (Opp. CMSJ at 8) yet it withholds the very information that Plaintiffs need to meaningfully challenge the government's conclusions. The D.C. Circuit's decision in *Vaughn*, while involving FOIA, is highly relevant here. In *Vaughn*, as here, the government's affidavit "set forth in conclusory terms the [affiant's] opinion that the [records] were not subject to disclosure[.]" *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C. Cir. 1973). Also, as in the present case, "only one side to the controversy (the side opposing disclosure) is in a position confidently to make statements categorizing information[.]" *Id.* "This lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution." *Id.* at 824. To restore the adversarial process as best as possible, courts should "simply no longer accept conclusory and generalized allegations of exemptions[.]" *Id.* at 828.

15

The informational asymmetry present in FOIA cases is equally present here, and thus it is appropriate to require a "more adequate, or rather less conclusory, justification in the Government's legal claims," *id.*, as to the applicability of the government's claim of statutory exemption from disclosure.

### B. Non-security information must be segregated and released if it meets the balancing test under *Hubbard*.

The government does not claim that all information contained in the Directives withheld pursuant to 2 U.S.C. § 1979(b) is security information. Rather, it argues that it should not be required to segregate and release portions of the Directives not containing security information because "the common law right of access under which Plaintiffs proceed is for 'records' not portions of records redacted for partial disclosure." (Opp. CMSJ at 7.) While the government is correct that the question of whether material is subject to the common law right of access is based on whether it is a public "record" as a whole, this misses the point entirely. The relevant question here is how the second step of the common law right of access should apply to material that has already been determined to be public records. Both generally and under 2 U.S.C. § 1979(b), redaction is an appropriate technique to maximize public disclosure while protecting any governmental interest in secrecy.

As to the use of redactions in cases involving the common law right of public access generally, the D.C. Circuit has recently held that at least some of the *Hubbard* factors should be applied to information within a public record, rather than the document as a whole, overruling the district court's decision to the contrary. *CNN, Inc. v. FBI*, 984 F.3d 114, 119 (D.C. Cir. 2021) ("We respectfully disagree with how the district court applied these factors. To be sure, there is — or at least was — enormous public interest in the Comey Memos. That's why CNN filed this

lawsuit in the first place. But there is little public value in the specific information that remains redacted in the Archey Declaration" (internal quotation marks omitted). In the context of the common law right of access to congressional records, Judge Henderson suggested in her concurrence in *Judicial Watch II* that "private information could be redacted in any disclosure." 998 F.3d at 998 (Henderson, J., concurring). This Court has also recently ordered the release of records under the common law right of access subject to redactions. *In re N.Y. Times Co.*, Case No. 1:21-cv--91 (JEB), 2021 U.S. Dist. LEXIS 233104 at *2, 2021 WL 5769444 (D.D.C. Dec. 6, 2021) ("[The court] will also order that . . . the remaining docket entries in the underlying case, be unsealed consistent with the limited redactions proposed by the Government") (internal citation omitted); ("Vanda will be permitted to review and redact these documents prior to their unsealing")

With respect to 2 U.S.C. § 1979, the government concedes that "Plaintiffs are correct that § 1979 refers to 'information' rather than documents," (Opp. CMSJ at 7) and makes no attempt to show that the language of the statute or its legislative history requires entire documents to be withheld merely because any part of the document contains security information. Instead, the government argues that "the common law right of access under which Plaintiffs proceed is for 'records' not portions of records redacted for partial disclosure," a contention which is a red herring for the reasons described above. The only other argument made by the government is to distinguish a case cited by Plaintiffs, *Leopold v. United States*, 964 F.3d 1121, 1125 (D.C. Cir. 2020), on the ground that the redactions there were made voluntarily by the government. (Opp. CMSJ at 7-8.) However, Plaintiffs cited *Leopold* only to point out that "[r]edaction is a familiar technique, including in cases involving the common law right of access." (CMSJ at 12.) The fact that the redactions in *Leopold* were made voluntarily by the government neither undermines this

17

point nor suggests that redaction is improper under 2 U.S.C. § 1979. For these reasons, this Court should order the government to segregate and release any information that is not security information under 2 U.S.C. § 1979 and that otherwise meets the *Hubbard* test.

IV.    **Plaintiffs have a common-law right of access to the Capitol Police Office of Inspector General's Semiannual Reports.**

A.    **The Semiannual Reports memorialize official actions or statements and are not preliminary material.**

The government argues that "the OIG SARs . . . are not official actions or decisions by the agency but rather findings and, if warranted, recommendations from the Inspector General for official action to Capitol Police leadership." (Opp. CMSJ at 16.) Thus, according to the government, they are "preliminary materials" which are not "public records." (Opp. CMSJ at 16.)

The government's position, however, confuses several aspects of the "public records" test and rests on a cramped reading of *WLF II*. The D.C. Circuit defined a public record as (1) "a government document"; (2) "created and kept for the purpose of memorializing or recording"; (3) "an official action, decision, statement, or other matter"; (4) "of legal significance, broadly conceived." 89 F.3d at 902. Insofar as the government is arguing that the SARs are not "official actions or decisions," it is incorrect to focus solely on "official actions or decisions" because a public record may also consist of a "statement[ ] or other matter[.]" *Id.* A SAR is clearly a "statement," and the government does not suggest that it was prepared by the OIG in anything other than an official capacity. Further, the preparation of the SARs is an official action. In *WLF II*, the D.C. Circuit described as an "official action" the Advisory Group's "recommending sentencing guidelines to the Commission." *Id.* at 906. The Advisory Group's final report

18

memorializing these recommendations would therefore be a memorialization or recording of an official action. Likewise, the SARs memorialize the official actions of the OIG.

To the extent that the government is arguing that only written memorials of "official actions or decisions" undertaken by "the agency" is a public record, (Opp. CMSJ at 16) this too is incorrect. There is no requirement in *WLF II* or any other case cited by the government that the official action or decision be that of an "agency," as opposed to an officer of the agency. The government may be borrowing the concept of "agency action" from the Administrative Procedures Act, but that statutory framework is not applicable here.

The government's mistaken reading of *WLF II* leads it to incorrectly conclude that the SARs are preliminary materials. Under the government's view, a report would almost invariably be preliminary material because reports are intended, by their nature, to be read, considered, and relied upon by someone other than the author. However, the D.C. Circuit's holding in WLF II makes clear that the court did not contemplate "preliminary materials" to be so expansive. In providing examples of what does not count as a public record because it is too preliminary, the D.C. Circuit included as examples "a government auditor's preliminary notes used in the preparation of an official report" and "a cover memorandum circulated with a copy of an official report or study." *WLF II*, 89 F.3d at 906. It would make little sense for the D.C. Circuit to have used these examples if it contemplated that an "official report" itself would not qualify as a public record.

### B.  Materials required by law to be compiled or kept have legal significance.

In their opening brief, Plaintiffs proposed that "documents may qualify as public records by virtue of the fact that a government official is required by law to compile them." (CMSJ at 20.) The D.C. Circuit assumed this to be the case for the sake of argument but found it unnecessary to decide whether to adopt this view as federal common law. *WLF II*, 89 F.3d at 907 ("Assuming, *arguendo*, the WLF's premise that any document 'required by law to be kept' is necessarily a public record for the purpose of the federal common law right of access, we disagree with the WLF's construction of the Sentencing Reform Act.") As Plaintiffs previously explained, state common law – the source of authority upon which the D.C. Circuit relied to define a "public record" – supports the view that any document required by law to be kept is necessarily a public record. (CMSJ at 20-21.)

The government responds that the D.C. Circuit's decision in *WLF II* "refused to adopt" the "required by law to be kept" standard in favor of a different definition, and adopting this standard would "upset the governing test." (Opp. CMSJ at 18.) Plaintiffs' proposed rule, however, fits comfortably with the definition the D.C. Circuit adopted for a public record and most states' common law.

To begin with, the D.C. Circuit explained that "[b]y default we must look for the contours of the right of access in the common law of the states[.]" *WLF II*, 89 F.3d at 904. The government fails to even acknowledge the role of state common law in resolving the issue of whether documents may qualify as public records by virtue of the fact that a government official is required by law to make and keep them. In contrast, Plaintiffs cite to numerous state common law decisions applying this or a similar rule, as well as the venerable treatise *American Jurisprudence*. (CMSJ at 20-21.)

In crafting its own definition of a "public record," the D.C. Circuit observed that there was a range of definitions employed by the common law of the states. The "most restrictive" definition included only written memorials "required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said, or done." *WLF II*, 89 F.3d at 904. "At the other end of the spectrum," the D.C. Circuit explained, was the common law of New Jersey, which included documents "whether or not required by law to be made, maintained or kept on file." *Id.* Thus, across the range of state common law, there is an agreement that a written memorial required by law to be made or maintained is a public record.

Plaintiffs' proposal is narrow and would not change the definition of a "public record" ultimately adopted by the D.C. Circuit. The only element it would be relevant to is the requirement that the document memorialize or record a matter of "legal significance, broadly conceived." A written memorial required by law to be created and maintained is necessarily a document having "legal significance" in the broad sense of that term. As Plaintiffs previously explained, "Where a specific document is required by law to be created, the document is not just evidence of the process by which official business is conducted, it *is* the end product of the official business of the government." (CMSJ at 21) (emphasis in original). A rule deeming a certain category of documents to be of legal significance is not inconsistent with the D.C. Circuit's definition of a public record. To the contrary, in *WLF II*, the D.C. Circuit held that as a categorical matter, all documents filed with the court are necessarily and by their very nature of legal significance. 89 F.3d at 906 ("A court proceeding . . . is in its entirety and by its very nature a matter of legal significance; all of the documents filed with the court, as well as the transcript of the proceeding itself, are maintained as the official 'record' of what transpired.") Similarly, a

document required by law to be made or maintained is, by its very nature, a matter of legal significance since it is a part of the official "record" of government activity.

Finally, the government raises two policy issues. First, it argues that "Plaintiffs' rule would effectively transform the Federal Records Act into a disclosure statute." (Opp. CMSJ at 19.) Plaintiffs' rule would not require disclosure of any document simply because it is subject to the Federal Records Act, however, nor would it even require every such document to be considered a "public record." At any rate, it is not clear what would be so problematic about deeming any "documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency" to have legal significance. (Opp. CMSJ at 19.)

Second, the government argues that Plaintiffs' position "would create an end-run around Congress's carving the USCP out of the public disclosure requirement for those very SARs." (Opp. CMSJ at 19.) However, Congress's silence on the question of whether the USCP OIG SARs should be made public does not represent an affirmative choice to prohibit public release of those documents. If Congress wanted to prohibit release of a category of records, it knew how to do so. *See e.g.*, 5 U.S.C. § 552 (Freedom of Information Act). To the extent that Congress's intent is even relevant to this situation, where there is no ambiguous statute to interpret, it is more likely that Congress intended to leave the USCP OIG SARs in the same category as all other legislative branch documents – subject to a qualified right of disclosure under the common law. Congress legislates against the backdrop of common law, and this Court should not presume an intent to abrogate the common law right of public access to congressional records absent convincing evidence. *Schwartz v. United States DOJ*, 435 F. Supp. 1203, 1204 (D.C. Cir. 1977).

**V.      Plaintiffs have a common law right of access to Inspector General audits and other reports.**

The foregoing arguments as to why the SARs are public records subject to the common law right of access largely apply to the audits and other reports requested. However, given that the audits and other reports may concern any of a vast range of topics and the documents' structure has not been described, the submission of a *Vaughn* index is particularly critical as to these records.

**VI.     The 2017 Order of the Capitol Police Board does not require the withholding of information that does not fall within the statutory definition of "security information."**

As the government acknowledges, (Opp. CMSJ at 13) the 2017 Order, which prohibits the disclosure of OIG Information, purports to be an exercise of power "pursuant to the authorities provided under 2 U.S. Code § 1979[.]" Bolton Decl. Ex. A. Significantly, the government does not argue that the Capitol Police Board has the authority to prohibit the release of alleged "security information" to the extent that it does not fall within the statutory definition of "security information" contained in 2 U.S.C. § 1979. Plaintiffs' argument, put simply, is that the 2017 Order is an attempt by the Capitol Police Board to do just that. Thus, to the extent that the OIG information requested by Plaintiffs falls within the scope of the 2017 Order, but outside the definition of "security information" contained in 2 U.S.C. § 1979, the 2017 Order is no bar to disclosure. The government appears to acknowledge that such a category of information exists but makes no attempt to provide an alternative statutory basis for withholding such information. (Opp. CMSJ at 15) ("[T]he 2017 Order by its terms prohibits disclosure of not just 'security information' but all 'Office of Inspector General information,' and specifically identifies 'audit reports' and 'investigations reports' among the items covered.")

At most, the 2017 Order could be seen as analogous to an agency's interpretation of a statute. However, the government makes no claim that Capitol Police Board is entitled to deference – of the *Chevron* variety or otherwise – as to its interpretation of 2 U.S.C. § 1979. The 2017 Order also lacks persuasive value because it does not set forth any meaningful explanation as to why the Capitol Police Board views all OIG information as falling within the statutory definition of "security information."

Further undermining any persuasive value that the 2017 Order may have, Plaintiffs point to several examples of OIG information which are not security information. (CMSJ at 23-25.) The purpose of these examples is not to suggest that all OIG information must be released because some of it has been released. Instead, Plaintiffs are simply attempting to illustrate that the 2017 Order's assertion that all OIG information is security information is not persuasive. While the government offers various rationales as to why OIG information was properly disclosed in each instance, its arguments only serve to highlight the lack of necessary nuance in the 2017 Order's broad and categorical classification of all OIG information as "security information." This lack of nuance undermines any persuasive value that the 2017 Order may otherwise carry.

Additionally, by showing that some OIG information does not fall within the statutory definition of "security information," Plaintiffs' examples demonstrate that the government's categorical approach to withholding OIG information is improper and highlights the need for a *Vaughn* index and detailed explanation of the records at issue. The information that Plaintiffs could glean from the public record, including the titles of a few Capitol Police Inspector General reports and the nature of Inspector General reports issued by other law enforcement and intelligence agencies, is presented to this Court to show concrete examples of the mismatch between what constitutes "OIG information" and the statutory definition of "security

information." The vast range of topics covered by Capitol Police Inspector General reports raises sufficient doubt as to whether all Capitol Police OIG information falls within the statutory definition of "security information" as a categorical matter. As such, the 2017 Order cannot provide the sole basis for nondisclosure.

### VII.    Plaintiffs have a statutory right to Capitol Police Office of Inspector General audits and reports which recommend corrective action.

The government's argument proceeds from the faulty premise that any time a statutory cross-reference is used, the reference canon applies. (Opp. CMSJ at 20.) In doing so, the government wholly fails to address Plaintiffs' point that the reference canon, like any canon, is an interpretative tool that cannot overcome the natural reading of the statute.

To the extent that the government addresses the actual language of the statute, its hypertechnical distinction between "*the* same duties and responsibilities" and "*all* the same duties and responsibilities" (Opp. CMSJ at 21) is the antithesis of focusing on the natural reading of the statute. *See Atl. States Legal Found. v. United Musical Instruments*, 61 F.3d 473, 477 (6th Cir. 1995) ("We reject this rather hypertechnical parsing of the language of the statutes in favor of the most natural reading[.]") Under either phrasing, the provision plainly synchronizes the USCP Inspector General's duties and responsibilities with those of other Inspectors General. Indeed, in the case primarily lied upon by the government, the Supreme Court read the statutory phrase "*the* same immunity," 22 U.S.C. §288a(b), to "continuously link the immunity of international organizations to that of foreign governments[.]" *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 768 (2019).

Respectfully Submitted,

  /s/ Jeffrey Light
Jeffrey L. Light, D.C. Bar #485360
1629 K St., NW, Suite 300
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

*Counsel for Plaintiffs*